No. 53,076

STATE OF KANSAS, *Appellee,* v. CECILIA MORTON, *Appellant.*

(638 P.2d 928)

Opinion filed
January 15, 1982.

*John D. Clark,* of Wichita, argued the cause and was on the brief for the appellant.

*Beverly Dempsey,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Clark V. Owens,* district attorney, were with her on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: Cecilia Morton was convicted by a jury of murder in the second degree (K.S.A. 21-3402) for the death of her two and one-half year old foster son, Dennis Rizer, on June 17, 1980. This appeal followed.

Dennis and Denny Rizer, twin brothers, came to live with Steve and Cecilia Morton in Wichita in early June, 1980. Social and Rehabilitation Services had previously approved the Mortons as foster parents for the two boys. They appeared to be normal two and one-half year olds. Denny was the more aggressive of the two, sometimes hitting other children and throwing toys. During the week before his death, Dennis was characterized by the Mortons as becoming "kind of a problem" with his incessant crying and misbehaving. Once, while Cecilia was spanking Dennis because he wouldn't stop crying, Steve had to intervene. Dennis's behavior "was wearing on her a little bit," according to Steve. Morton also testified he saw Cecilia give Dennis a "slight tap on the head." Another time as he started to go to work Morton saw Cecilia give Dennis "a little toss on the bed." Her conduct disturbed Morton enough that he waited until Cecilia's actions were completed before he proceeded to work.

On June 15, 1980, the Mortons took the twins with them to Steve's grandmother's home to care for her dogs while she was away. They put the twins to bed there. Cecilia testified she heard a thump about 11:00 p.m. in the bedroom where the boys were

sleeping. They investigated and found Dennis had fallen off the end of the bed onto a concrete floor covered by a thin carpet. Dennis did not awaken when he hit the floor. Steve picked him up, checked his head and put him back to bed. Uncontroverted testimony indicated the height of the bed was approximately three feet. The Mortons left Steve's grandmother's house between midnight and 1:00 a.m.

The next morning, June 16, Mr. Morton left for work at 7:45 a.m. At approximately 11:00 a.m. he received a call from Cecilia advising him Dennis had just fallen off a chair in the kitchen and "his eyes were rolling back into his head." Morton rushed home and with his wife took Dennis to the emergency room of St. Francis Hospital. There Dennis was examined by Dr. Nonhof who found Dennis a little drowsy, but alert and awake. Dennis was dismissed and the Morton's were given a "head trauma sheet" to assist in spotting any future problems. No x-rays were taken.

Dennis was then taken home and put to bed. Cecilia testified he awoke later and began to play in the living room with the family dog. Dennis then "all of a sudden collapsed on the floor." Mrs. Morton became frightened and called the social worker who told her to call emergency services. This she did and then called Mr. Morton at work. At this point Cecilia tried to perform CPR on Dennis.

Dennis was transported to the emergency room at St. Francis for the second time that day. By the time the ambulance reached the hospital, his heart had stopped. Resuscitation efforts produced a heartbeat but Dennis remained comatose. The nurse on duty testified she observed no bruises on Dennis's body other than the discoloration caused by the I.V.'s. The doctor on duty testified there was no external evidence of a head injury.

At about 10:30 that evening Dennis was examined by a neurologist. He noticed a papilledema, which is caused by swelling of the optic nerve and is often the result of a head injury. The doctor testified a papilledema takes at least 18 hours to develop. Dennis remained without brain activity until he died the next morning, June 17, 1980.

Dr. William G. Eckert performed an autopsy. He testified as to his findings. They included bruises on the legs and inner thighs, on the side of the neck, above the right eye, on the buttocks, and

on the cheek and back. He also found an area of bruising on the back of the head, at the base of the skull. This area corresponded to two separate skull fractures which, in Dr. Eckert's opinion, caused swelling of the brain and death. Dr. Eckert further testified he thought both fractures resulted from either one very severe blow or from the head striking a surface which had two separate fixed areas. He believed the head injuries could have been caused by a fall from the height of a chair if the child were propelled downward. He admitted some of the bruises to the body could have been caused by resuscitative efforts but he testified many of the other bruises were "out of the range of the area" CPR efforts would affect.

Immediately following Dennis's death the Wichita police department launched an investigation. During the rest of June and all of July, Detective Jan McCloud interviewed those involved with the case. In the course of her investigation Detective McCloud received a phone call from Cecilia Morton asking her to examine the bedroom at Steve's grandmother's house where Dennis had fallen out of bed. This investigation revealed several strands of hair on the bicycle chain close to the spot where Dennis had fallen. Lab tests disclosed the hairs did not match those of Dennis Rizer or any of the persons present at the time of the fall. On a previous visit to the same house, Detective McCloud's examination of the bicycle had turned up no hairs. Cecilia Morton was then charged with second degree murder.

Appellant's first issue on appeal is that the trial court erred in failing to admonish the jury regarding an improper statement made to the jury by the bailiff. During the jury deliberations, Jacquelyn Lewis, bailiff, was summoned to the jury room and asked "[i]f the defendant fell under the felony murder rule." She told the jury the defendant did not. No felony murder instructions had been given. Appellant contends the question indicates the jury was confused and was not following instructions and the trial judge's failure to admonish or give a clarifying instruction constitutes reversible error.

The Kansas statute relating to criminal jury trial procedure is K.S.A. 22-3420. Subsection (3) of that statute provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the

defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

The bailiff, of course, had no authority to answer the jury's question. She should have kept silent and passed the request on to the judge. Kansas law, however, indicates her improprieties do not rise to the level of reversible error. For example, in *State v. Harrington,* 148 Kan. 602, 606, 83 P.2d 659 (1938), the court dealt with legally correct advice given by a bailiff in response to a juror's question regarding leniency. The court held the bailiff's conduct, although irregular, did not constitute prejudicial error because the merits of the case were not discussed with the jury. See also *State v. Russell,* 182 Kan. 649, 655, 323 P.2d 913 (1958). Moreover, assuming the judge knew about the question and the improper conduct of the bailiff, his failure to admonish the jury or answer the question was not error.

The obligation of the trial court pursuant to K.S.A. 22-3420 was fully discussed in *State v. Bandt,* 219 Kan. 816, 549 P.2d 936 (1976). In that case the defendant was charged with theft and there was a question whether or not he knew certain property was stolen when he received it. The jury's question to the court was whether the defendant was "under the same kind of guilt" when he discovered the property was stolen as he would have been had he known the property was stolen the minute he received it. p. 821. The trial judge refused to give supplemental instructions regarding the question. The Supreme Court reversed saying "Under the circumstances the trial court was obligated to further instruct the jury . . . ." p. 823. This was because the jury was "obviously confused" and the jury's question to the court "raised a clear-cut question of law . . . ." pp. 822-23.

The major concern of this court in *State v. Bandt,* however, was the fact the trial court permitted counsel for both parties to present to the jury their conflicting statements of law. When the trial court subsequently refused to answer the question, the effect was that the jury determined the issue of defendant's guilt or innocence by choosing between the legal theories of the county attorney and defense counsel.

The *Bandt* court went on to state principles more applicable to the case at bar:

"We wish to make it clear that instances may sometimes occur in the course of a trial where the jury raises questions which are irrelevant or which are already

adequately covered by the original instructions. Under those circumstances the trial court may decline to answer such questions and direct the jury to re-read the instructions already given. A trial court is vested with a great amount of discretion in answering questions directed to him by a jury after the jury has begun its deliberations. The important consideration is that the jury be properly instructed on the essential issues presented at the trial and this is particularly true in a criminal proceeding where the questions presented by the jury involve the basic elements of the criminal offense on which the defendant is being tried." pp. 823-24.

See also *State v. Bryant,* 5 Kan. App. 2d 114, 116, 612 P.2d 1255 (1980).

The failure to admonish or further instruct here did not amount to an abuse of discretion. See *State v. Sully,* 219 Kan. 222, 228, 547 P.2d 344 (1976). The jury was properly instructed as to the essential elements of second degree murder. The question asked was irrelevant, and the answer was in favor of the appellant, showing no prejudice. Further, unlike *Bandt,* no legal arguments regarding the question were made in the presence of the jury.

Appellant's other contention is that the evidence was insufficient to find the appellant guilty beyond a reasonable doubt.

"In a criminal action where the defendant contends the evidence at trial was insufficient to sustain a conviction, the standard of review on appeal is: Does the evidence when viewed in the light most favorable to the prosecution convince the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt? [Citations omitted.] In considering the sufficiency of evidence to sustain a conviction, this court looks only to the evidence in favor of the verdict, it does not weigh the evidence and if the essential elements of the charge are sustained by any competent evidence the conviction must stand." *State v. Peoples,* 227 Kan. 127, 133, 605 P.2d 135 (1980).

See also *State v. Everson,* 229 Kan. 540, 542, 626 P.2d 1189 (1981). To establish its charge the State had to prove the appellant killed Dennis Rizer and the killing was done maliciously.

Appellant first attacks the sufficiency of the evidence by contending the State failed to prove the corpus delicti. She relies heavily on *State v. Doyle,* 201 Kan. 469, 441 P.2d 846 (1968), wherein it was stated "[t]he corpus delicti is the body or substance of the crime which consists of the killing of the deceased by some criminal agency, and is established by proof of the two facts, that one person was killed, and another person killed him." p. 477. The corpus delicti may be proved by direct testimony, by indirect or circumstantial evidence, or by a combination of both. *State v. Pyle,* 216 Kan. 423, 432, 532 P.2d 1309 (1975). Appel-

lant's reliance on *State v. Doyle* stems from a passage at page 479 of that opinion where the court said:

"Where the circumstances are as consistent with the absence as well as the presence of crime, the corpus delicti has not been proved since the evidence is susceptible to a construction which will prove innocence as well as guilt."

This passage suggests the State must completely disprove the possibility of death by natural or accidental causes. This suggestion, however, has not been followed and later cases have repeatedly distinguished *Doyle* on the basis of its facts. See *e.g., State v. Foster,* 229 Kan. 362, 366, 623 P.2d 1360 (1981); *State v. Johnson,* 220 Kan. 720, 723, 556 P.2d 168 (1976); *State v. Sparks,* 217 Kan. 204, 208-09, 535 P.2d 901 (1975), all involving convictions for the murder of a child. These cases are distinguished from *Doyle* because in *Doyle* the defendant was not shown to be at the scene of the alleged crime. Further, in each of these cases the victim had been in the care of the defendant prior to the time the fatal injuries occurred. The same distinguishing factors occur in the case at bar.

In the present case it is apparent Dennis's death *could* have been the result of an accident; however, the State produced the testimony of a well qualified expert, Dr. William G. Eckert, who testified it was unlikely the skull fractures were caused by falling out of bed or off a chair unless the child was propelled. The weight of his testimony was for the jury to consider. They believed him. Under the facts of this case the corpus delicti was adequately established.

Assuming the corpus delicti had been sufficiently shown, is the State's evidence sufficient to prove appellant guilty beyond a reasonable doubt?

The State's case here rested almost entirely on circumstantial evidence. It is a well established rule, however, that circumstantial evidence can be used to prove any element of a crime, and can sustain a conviction of even the gravest offense. *State v. Henderson,* 226 Kan. 726, 731, 603 P.2d 613 (1979); *State v. Johnson,* 220 Kan. at 722; *State v. Sparks,* 217 Kan. at 207-08. Further, the theory that the prosecution is under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt has been rejected. *Jackson v. Virginia,* 443 U.S. 307, 326, 61 L.Ed.2d 560, 99 S.Ct. 2781, *reh. denied* 444 U.S. 890 (1979); *State v. Henderson,* 226 Kan. at 732.

The evidence supporting the verdict consisted of appellant's conduct toward Dennis. Steve Morton testified he had observed Cecilia angrily throw Dennis onto a bed, hit the child and lose such control in spanking that it was necessary to intervene. Morton also testified he questioned Cecilia concerning bruises he had observed on Dennis's body. Although his testimony tended to minimize the severity of the blows administered by his wife, he conveyed the information to the jury that Cecilia had imparted physical blows to the child during his two and one-half week stay in their home. When the foregoing evidence is coupled with Dr. Eckert's testimony regarding the cause of death and the extent and origins of Dennis's injuries, a persuasive case is made against Cecilia. This is a classic "child abuse syndrome" case. The perpetrator of the abuse is the caretaker of the child; the child is too young and intimidated to report the offenses; the abuser claims the bruises and contusions originated with accidental falls. In spite of this, however, fundamental due process must prevail. There must be sufficient evidence introduced, taken in the light most favorable to the State, for a rational fact-finder to find an accused guilty beyond a reasonable doubt. When we examine the testimony of Steve Morton and Dr. Eckert, along with Cecilia's conduct after suspicion focused on her, we must conclude the State's case satisfies the standard. The jury verdict was justified and will not be disturbed. Appellant's issue is without merit.

The judgment of the trial court is affirmed.