**Raymond BEAN and Judy Bean, Appellants,**

v.

**STATE of Indiana, Appellee.**

**No. 1181 S 331.**

Supreme Court of Indiana.

March 19, 1984.

Rehearing Denied May 15, 1984.

R. Steven Prifogle, Monroe County Deputy Public Defender, Bloomington, for appellants.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendants-appellants Raymond and Judy Bean are husband and wife. The couple was tried jointly in Monroe Superior Court on charges of manslaughter and neglect of a dependent. The trial concluded on May 6, 1981. Judy Bean was convicted of Voluntary Manslaughter, Ind.Code § 35–42–1–3 (Burns Repl.1979), and Neglect of a Dependent, Ind.Code § 35–46–1–4 (Burns Supp.1980), for which she received sentences of twenty (20) years and four (4) years, to be served consecutively. Raymond Bean was convicted of Involuntary Manslaughter, Ind.Code § 35–42–1–4 (Burns Repl.1979), and Neglect of a Dependent, for which he received sentences of eight (8) years and four (4) years to be served consecutively. They now appeal.

Six issues are raised on appeal, concerning:

1. whether defendant Raymond Bean could be convicted of neglect of a dependent and of manslaughter where it is alleged: that the deceased was not a dependent of Raymond Bean; that neglect of a dependent was a lesser-included offense of involuntary manslaughter; and that there was insufficient evidence to convict him of either offense;

2. whether there was sufficient evidence to convict Judy Bean of voluntary manslaughter;

3. whether there was an alleged conflict of interest in the joint representation of the defendants by the same attorneys;

4. whether the defendants were denied the effective assistance of counsel;

5. whether the trial court erred in refusing to grant a change of venue; and,

6. whether the trial court erred in refusing to hold a hearing on the defendants' motion alleging jury misconduct.

The evidence most favorable to the State reveals that the victim, Mary Ann Neely, was an adult incompetent, moderately retarded, and had spent most of her adult life in institutions. In December, 1977, Judy Bean was appointed guardian for Mary Ann. Mary Ann actually went to live with the Beans in 1976. Mary Ann had previously resided in the home of someone who was acquainted with the Beans. It is apparent from the record that Judy Bean knew having custody of Mary Ann would bring remuneration from the Welfare Department. It is also apparent that Judy Bean realized she could seize control of the Social Security checks Mary Ann received each month. Mary Ann was taken into the Beans' home and remained with them through 1976 and into 1977. There was a short period in 1977 when Mary Ann was taken back to a convalescent center. At that time she reported that she had been beaten by the Beans and feared going back to their home. Nevertheless, Mary Ann returned to the Bean residence and finally, in December, 1977, Judy Bean was made Mary Ann's legal guardian. Mary Ann continued to reside with the Beans in their home until she died in January, 1981. The testimony of the witnesses covering the time Mary Ann resided with the Beans revealed what can only be described as a very sordid story. The briefs submitted by both parties devote about 75 pages to the facts revealed through the testimony of witnesses. The challenge is to adequately describe these tragic events without overburdening the presentation of facts in this opinion.

Mary Ann Neely was a very small person, only 4 feet, 10 inches in height. Her condition was microcephalic, that is, her head was abnormally small. Her body was quite thin and had hardly any musculature. Mary Ann had improved mentally by 1975 and did not require further institutionalization. She was placed in the custody of foster homes and was able to function quite well. Although she did have a couple of accidents, she was not considered a clumsy person or one that could be described as "accident prone." She had injured her teeth in a bicycle accident and had a fracture in one of her feet prior to 1977. She also had injured one ankle when she turned it on an earlier occasion. X-rays taken in 1978 revealed that Mary Ann had only one hand fracture, in the right hand. There was also a showing of minor vertebrate or ligament calcification where she had received her ankle injury in 1973. When Mary Ann was examined at the hospital just prior to her death in 1981, and when an autopsy was taken, X-rays revealed that she had 12 fractures in her hands and over 30 fractures throughout her body.

During the time she was with the Beans, particularly from late 1977 until her death in 1981, Mary Ann's physical condition underwent a progressive and drastic change. Many witnesses testified they observed the Beans, more often Judy than Raymond, beating Mary Ann. The witnesses described incidents where Judy Bean struck Mary Ann with her fist and knocked her to the floor. Judy Bean would then kick Mary Ann with her feet. Judy Bean was observed poking Mary Ann with a broom and once while using a broom, Judy Bean struck Mary Ann across the back with such force that Mary Ann fell to the floor.

Jess Inman, a Bloomington police officer, testified that on February 14, 1977, he was called in on an alleged abuse case. This was the short period of time when Mary Ann was at a mental health clinic and convalescent center and temporarily out of the Beans' custody. Inman discovered that Mary Ann had made the call for help from the home of neighbors. She showed Inman some bruises on her thigh and leg, and some large, black bruises that were visible beneath her blouse. Mary Ann said she received whippings for no apparent reason from the Beans. Mary Ann told Inman that for months she had been abused by both Mr. and Mrs. Bean and when Mrs. Bean was away, Raymond would get mad and, for no reason, whip her with his boots. He would then place her in a closet for a long time. Officer Inman testified that it would be very difficult for Mary Ann to have inflicted those injuries on herself.

The State called many witnesses who identified themselves as acquaintances of the Beans. These witnesses had been inside the Bean residence many times during the period from 1977 to 1981. Some of these acquaintances were relatives of Mr. and Mrs. Bean, while others were baby sitters or house cleaners, social workers, and neighbors. These witnesses testified about incidents where Mary Ann Neely was either grossly neglected by the defendants or physically abused by them. One witness was a teacher in a school located across the street from the Beans' home. The teacher saw Judy Bean strike and kick Mary Ann in the front yard and then pick her up and throw her into the house. Several of the witnesses testified that the rest of the Bean family would be eating while Mary Ann was not allowed to eat anything. When she was allowed to eat, Mary Ann would sit in the corner by the refrigerator or somewhere on the kitchen floor. There were times the witnesses observed Mary Ann locked in the furnace room where she would remain for an entire day without food or water. Mary Ann looked undernourished and sickly, and always had bruises, sores, and many spots of dried blood or dried pus on her body. When Judy Bean went to work or went shopping, she would leave Mary Ann sitting in the pickup truck all day, sometimes in very hot weather.

A number of witnesses were merchants or bankers in the area. These witnesses testified that they conducted business with Judy Bean, who claimed to be Mary Neely. They sold microwave ovens, washing ma-

chines, and other appliances, on credit, to the woman represented to be Mary Neely and issued credit cards in the name of Mary Neely to her. Loans to buy a pickup truck and to buy a boat were secured in the name of Mary Neely. All of these purchases and credit arrangements began in 1977 and continued until 1981. The Beans later admitted they had made all of these purchases and falsely represented that they were being made by Mary Neely because the Beans themselves were heavily in debt and had no credit rating. Some of the accounts went into default and repossessions were made. Gary Gants, assistant district manager for Social Security in Bloomington, said that in December, 1977, Judy Bean started receiving Social Security checks as representative payee for Mary Ann Neely. The amounts ranged from $154.50 per month to $194.80 per month.

Sometime late on December 24, 1980, or on December 25, 1980, Mary Ann Neely was injured by a blow to the left side of the head. Judy Bean later informed her cellmate that she struck Mary Ann in the eye on Christmas Eve. Jimmy J. Newman, an emergency medical technician, made the ambulance run on January 3, 1981, to the Bean residence at 2412 Brown Avenue in Bloomington. Newman stated that the patient was Mary Ann Neely. Raymond Bean told Mr. Newman that Mary Ann had fallen and hit her head on a bathtub. Mary Ann was holding her head and her eyes were closed. She did not respond to questioning but after Newman administered an ammonia inhalant, Mary Ann was brought around and started answering questions. Newman described Mary Ann as being very small, thin haired, with sores on her face, and in very poor condition. When asked if she had fallen, Mary Ann said she had not. Newman said it was not his responsibility to decide whether she should go to the emergency room but Judy Bean said she would clean Mary Ann up and, if necessary, assume responsibility to take her to the hospital. Newman informed the Beans he would take her to the hospital if she was acting other than normal because she was in very bad shape. The Beans

assured him that she was acting normally and they would take care of her.

Paul Taylor is an emergency medical technician with the Bloomington Fire Department. Taylor was called to the Bean residence the next day, January 4, at 12:57 p.m. There he found Mary Ann lying on a small twin bed, covered to her shoulders and appearing to be in very poor condition. Taylor was told that Mary Ann injured herself by falling off the bathroom stool and hitting her head on the bathtub. The Beans said that happened either that morning or the night before. Judy Bean told him that Mary Ann was very clumsy and often fell and hurt herself. Mark Ellis Webb accompanied Taylor to the Bean home and he said the house was a mess. Mary Ann was very pathetic looking and was lying on a soiled bed containing a pillow that was moldy, mildewed, and without a pillow case. She had sores all over her face and a notch in her nose. Judy Bean said Mary Ann had fallen against the door and injured her nose. The injury looked like one that would require attention but did not appear to have been bandaged or cleansed in any way. Judy Bean also said that the sores on Mary Ann's face were an allergic reaction to the type of soap she was using. Mary Ann's teeth were missing and Judy Bean said that Mary Ann had awakened one morning without them and she assumed Mary Ann had swallowed them. Judy Bean seemed amused by this statement.

Dr. Paul Wenzler attended Mary Ann when she was admitted to the emergency room of the Bloomington Hospital on January 4. Mary Ann was at that time semi-comatose. Her temperature was unobtainable because it was below 94° F. and she had a bruise on the left upper eyelid area, the left side of the face, and the area of her left cheek. There were old scratches and scars on her face. The upper lip had been scarred so often that the lip was pulled up. There were rib fractures, a bruise over the area of the chest near the shoulders, and old bruises on both shoulders. There were multiple rales in the lungs, the abdomen

was distended, and there was an ulceration and obvious deformity of the right elbow. There were possible fractures of the right humerus and radial ulna bones, and multiple deformities of the fingers due to fractures that caused the fingers of the hands to curl inward. All together, the doctor found evidence of over thirty fractures throughout the body, and bruises and scars of varying ages. Despite the assistance of Dr. Wenzler, Mary Ann died the following day on January 5.

Dr. John E. Pless, a forensic pathologist, performed the autopsy on the body of Mary Ann Neely. Internal examination of the body revealed alteration of the fat tissues, seen in cases of malnutrition, which doctors refer to as serious atrophy. The fat turns pale, then liquefies in the fat cell. In addition, Dr. Pless found brown fat which is associated with a malnourished state. Inside the abdomen there was an old injury within the mesentery which attaches the bowel to the back of the spine. In this area there was a destruction of the fatty tissue, indicating a severe blow in the past. The ribs of the chest were marked by numerous fractures. Dr. Pless indicated a great number of injuries found throughout the body were compatible with the use of blunt force. Examination of the left side of the brain showed a recent hemorrhage, indicated by a collection of blood beneath the dura, the fibrous membrane of the brain. This injury, according to Dr. Pless, could have occurred anytime from a matter of hours to a few days prior to death. Examination of the right side of the brain showed a hemorrhage between eight (8) days and two to three weeks old. This would be caused by application of blunt force or by extreme shaking, as in a case of child abuse. This earlier subdural hematoma would have rendered Mary Ann more susceptible to continued hemorrhage because the veins that bridge the fibrous membrane of the dura and the brain itself are torn. They are then susceptible to re-tearing or re-rupturing. Dr. Pless said the bruising around the left eye could have been the injury which initiated the whole process. Dr. Pless said the cause of death was multiple blunt force injury of the body, resulting in a subdural hemorrhage and swelling of the brain. Mary Ann's weakened and undernourished condition contributed to her death. She still could have survived, with proper treatment, the first subdural hematoma but the second subdural hematoma sealed her fate. Mary Ann had to have been very ill for several days and this condition should have been obvious to the people around her.

I

Defendant Raymond Bean claims he could not be convicted of neglect of a dependent or of involuntary manslaughter, resting on the underlying felony of neglect of a dependent, when the deceased in this case had no legal dependency relationship to him. He also argues that neglect of a dependent was a lesser-included offense in the conviction of involuntary manslaughter and therefore he could not be sentenced on both offenses. He finally claims there was insufficient evidence to convict him of either offense.

Both Raymond and Judy Bean were charged jointly in the information. Count I, charging neglect of a dependent, reads as follows:

"[B]oth persons having the care, custody and control of Mary Ann Neely, a dependent, did knowingly place Mary Ann Neely, their dependent, in a situation endangering her life and health, to-wit: depriving Mary Ann Neely of adequate nutrition, permitting injuries to remain unattended and inflicting physical (sic) injury upon the person of Mary Ann Neely."

Count II, the involuntary manslaughter count, stated that Raymond and Judy Bean:

"did kill Mary Ann Neely while committing Neglect of a Dependent, I.C. 35-46-1-4, a class D Felony that inherently poses a risk of bodily injury, by failing to provide adequate nutrition for Mary Ann Neely, by permitting physical (sic) injuries suffered by Mary Ann Neely to re-

main unattended and by inflicting serious bodily injury upon the person of Mary Ann Neely."

The information was later amended to charge Judy Bean with voluntary manslaughter.

Ind.Code § 35–46–1–4, neglect of a dependent, contained the following language at the time the Beans were charged with the crime:

"A person having the care, custody, or control of a dependent who knowingly or intentionally:

(1) places the dependent in a situation that may endanger his life or health;

(2) abandons or cruelly confines the dependent;

(3) deprives the dependent of necessary support; or

(4) deprives the dependent of education as required by law; commits neglect of a dependent, a Class D felony. . . ."

(I.C. 35–46–1–4, as added by Acts 1976, P.L. 148, § 6; 1977, P.L. 350, § 87; 1978, P.L. 144, § 8; 1980, P.L. 208, § 1; for present language *see* Ind.Code 35–46–1–4 (Burns Supp.1983))

Judy Bean was made the legal guardian of Mary Ann Neely in December, 1977. Raymond Bean was not mentioned in the legal document. Raymond points to this as proof that he cannot be convicted of neglect of a dependent. The statute, however, clearly provides that one who has the *care, custody,* or *control* of a dependent may be held liable for acts that constitute neglect of a dependent. A dependent is defined as: "(1) [a]n unemancipated person who is under eighteen [18] years of age; or (2) a person of any age who is mentally or physically disabled." Ind.Code § 35–46–1–1 (Burns Repl.1979). There is no requirement in Ind.Code § 35–46–1–4 that the person charged with the crime be the legal guardian or natural parent of the child or incompetent adult. The evidence clearly showed that Raymond Bean knew Mary Ann Neely was a dependent and that both he and Judy Bean were concerned with the care, custody, and control of Mary Ann. Raymond's actions, recounted later in the

sufficiency portion of this issue, reflect the abusive control he exerted over Mary Ann. He, along with Judy, controlled the activities of their home. Both husband and wife worked to maintain their residence and Mary Ann played a vital role in this scheme. Judy Bean's appointment as legal guardian over Mary Ann Neely did not reduce Raymond's relationship or responsibility to Mary Ann Neely under the facts or circumstances of this case. The evidence at trial revealed that Raymond Bean was not merely a passive participant in the sordid events that accounted for Mary Ann's presence in the Bean residence. Thus, Mary Ann Neely was a dependent in the care, custody, and control of Raymond Bean.

 Furthermore, the State's position is well taken that when a person acts as a confederate or accomplice of another, the acts of the accomplice will be imputed to that person. Where a person acts in concert with other participants in a crime, it is not necessary that the State prove the defendant personally committed every act constituting the perpetration of an offense. One who aids or abets another or induces or causes another to commit a criminal offense can be charged with that offense and tried and convicted as a principal. *Harris v. State*, (1981) Ind., 425 N.E.2d 154; *Hogan v. State*, (1980) Ind., 409 N.E.2d 588; *Howard v. State*, (1978) 268 Ind. 589, 377 N.E.2d 628, *cert. denied* 439 U.S. 1049, 99 S.Ct. 727, 58 L.Ed.2d 708. Raymond Bean's claim that his conviction could not be upheld on the theory that there was no legal dependency between him and Mary Ann Neely has no merit.

 Defendant Raymond Bean also claims that he cannot be convicted of neglect of a dependent and at the same time be sentenced for involuntary manslaughter. Raymond argues that neglect is a lesser-included offense of involuntary manslaughter and a conviction for neglect of a defendant is precluded by double jeopardy considerations insofar as the neglect necessarily rests on the proof of the same acts which

must be proved to establish involuntary manslaughter. Raymond relies on the holding of *Smith v. State,* (1980) Ind.App., 408 N.E.2d 614, in support of his position. Defendant is, of course, correct about the holding of *Smith,* but the variation in the facts presented in the two cases produces two different results.

In *Smith,* defendant Lawanna Smith was convicted of neglect of a dependent and involuntary manslaughter, just as defendant Raymond Bean was convicted in the present case. Smith's son was killed due to the beatings administered by Lawrence Burkhalter, Smith's boyfriend. The death blows were dealt during the course of one day, February 19, 1978. Burkhalter severely beat the four-year-old boy and held him under water for several periods of time because he was not able to spell "butterfly." The Court of Appeals found that the acts necessary to convict Smith of neglect of a dependent were the same acts necessary to convict her of involuntary manslaughter. This Court has held that sentences cannot be imposed separately for felony murder and the underlying offense that gives rise to the felony murder. *Williams v. State,* (1978) 267 Ind. 700, 373 N.E.2d 142. Using this rationale, the Court of Appeals wrote that where conviction of the lesser crime, neglect of a dependent, is used to convict the defendant of the greater crime, involuntary manslaughter, "the double jeopardy clause of the Fifth Amendment ... bars separate sentencing upon the lesser crime when sentencing is imposed upon the greater one." 408 N.E.2d at 622.

The fact situation is different in the present case. Direct and probative evidence was presented to the jury which showed that these defendants had committed virtually scores of acts of neglect at various times and in a continual pattern for a period of three years. The jury could have inferred or found that either one, or both, of these defendants was guilty of neglect of a dependent based on the many incidents that occurred prior to the last ten or eleven days of Mary Ann Neely's life. The evidence was replete with the testimony of several witnesses describing the beatings and deprivations suffered by Neely. A total of thirty-two fractures of various ages were found during the autopsy of Mary Ann Neely. She suffered from severe malnutrition which arose from a lack of nourishment over a long period of time. This testimony, plus other separate incidents during Mary Ann's three year stay with the Beans, implicated both of the defendants on charges of neglect of a dependent.

There was ample evidence, however, from which the jury could also find that the manslaughter charges were based on events which occurred during the last two weeks of Neely's life. These acts are separate and independent from the acts which occurred earlier during the three year period. Mary Ann received a severe blow to her head, evidenced by a subdural hematoma, around Christmas, 1980. During the following days, and especially on January 3, 1981, when the emergency aid crew first went to the Bean residence, Mary Ann was in need of immediate medical attention and protection. The emergency crew was ready and willing to take Mary Ann to the hospital but help was refused by Raymond and Judy Bean who said they would take care of her and that Mary Ann was acting normally. Dr. Pless testified that the first blow made Mary Ann seriously ill and she was fighting for her life. The second blow caused a subdural hematoma on the other side of the brain, and, in Dr. Pless' opinion, occurred shortly before he examined Mary Ann on January 4, 1981. This second blow was the *coup de grace* that spelled the end of the fragile and unfortunate existence of Mary Ann Neely at the hands of these defendants. The jury could well have found that these events justified its finding that Raymond Bean was guilty of involuntary manslaughter, based on his actions which were independent of the numerous acts, occurring during the previous three year period, that also convicted him of neglect of a dependent.

Finally, defendant Raymond Bean claims there was insufficient evidence to convict

him of neglect of a dependent and involuntary manslaughter. In reviewing sufficiency of the evidence claims, this Court will not reweigh the evidence nor judge the credibility of the witnesses. We look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value from which the jury could make its findings beyond a reasonable doubt, we will not disturb the verdict. *Lenn v. State*, (1982) Ind., 437 N.E.2d 56; *Hubbard v. State*, (1982) Ind., 437 N.E.2d 52.

There was sufficient evidence to convict Raymond Bean of neglect of a dependent. The State proved that Raymond Bean knowingly and intentionally placed Mary Ann Neely in a situation that endangered her life or health. Ind.Code § 35–46–1–4. Testimony from witnesses showed that Raymond kicked Mary Ann so hard one day that he limped the next day while at work. Raymond confined Mary Ann in a furnace closet for a long period of time. He forced her to carry heavy loads of sand for his construction project out in the yard. The autopsy report indicated that for a long while Mary Ann had not been given the proper nourishment. Raymond and his wife had the care, custody, and control of Mary Ann. Defendant's claim of insufficient evidence has no merit.

The statute for involuntary manslaughter, Ind.Code § 35–42–1–4 (Burns Repl. 1979), reads as follows:

A person who kills another human being while committing or attempting to commit:

(1) A class C or class D felony that inherently poses a risk of serious bodily injury;

(2) A class A misdemeanor that inherently poses a risk of serious bodily injury; or

(3) Battery;

commits involuntary manslaughter, a class C felony. However, if the killing results from the operation of a vehicle, the offense is a class D felony.

As related above, there was sufficient evidence to show that Raymond Bean was guilty of neglect of a dependent during the last days of Mary Ann's life. The emergency medical technicians testified that Raymond and Judy Bean were not willing to move Mary Ann to a hospital on January 3, 1981. At that time she was in serious danger of losing her life. The Beans allowed Mary Ann to linger under unsanitary conditions, lying on a soiled bed containing a pillow that was moldy and mildewed. Neglect of a dependent is a class D felony and this crime was used to prove the involuntary manslaughter. Defendant Raymond Bean was properly convicted on both counts.

## II

■ Defendant Judy Bean claims there is insufficient evidence to convict her of voluntary manslaughter. As we stated in Issue I, *supra*, this Court will not reweigh the evidence nor judge the credibility of the witnesses. We look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value from which the jury could make its findings beyond a reasonable doubt, we will not disturb the verdict. *Lenn, supra; Hubbard, supra.*

The statute concerning voluntary manslaughter, Ind.Code § 35–42–1–3 (Burns Repl.1979), reads as follows:

(a) A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a class B felony.

(b) The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder under section 1(1) [35–42–1–1(1)] of this chapter to be voluntary manslaughter.

Defendant Judy Bean claims that the State failed to prove the existence of sudden heat and that there was no evidence to show that Judy Bean caused the second subdural hematoma.

■ The State properly points out that sudden heat is not an element of the of-

fense of voluntary manslaughter but is a mitigating factor in the relationship of voluntary manslaughter to murder and it is not the State's burden to prove the existence of a mitigating factor. *Russell v. State,* (1981) Ind., 419 N.E.2d 973; *Hardin v. State,* (1980) Ind., 404 N.E.2d 1354. Our decision in *Hedrick v. State,* (1982) Ind., 430 N.E.2d 1150, cited by the defendant, does not aid her here. In *Hedrick* we held that the evidence had established sudden heat but we did not state or infer that sudden heat was a necessary element to be proved by the State in every case of voluntary manslaughter. As a mitigating factor, sudden heat serves to negate the culpability for murder rather than to establish a degree of culpability. *Wolfe v. State,* (1981) Ind., 426 N.E.2d 647.

The evidence at trial showed that Judy Bean repeatedly beat and kicked Mary Ann Neely over a three year period but always claimed that Mary Ann fell because she was clumsy. Judy Bean admitted to a cellmate that she hit Mary Ann with her fist on Christmas Eve, 1980, and gave Mary Ann a horrible black eye. This occurred a week before Mary Ann's death. Dr. Pless stated on cross-examination that the blunt force that caused the deadly hematoma could have resulted from a fall on the floor, a baseball bat, or a fist. While, admittedly, there was no direct evidence to show Judy Bean struck Mary Ann and caused the second fatal hematoma, it is not unreasonable for a juror to conclude that whenever Mary Ann Neely sustained an injury due to her clumsiness, it was really inflicted by Judy Bean. We find that a reasonable jury could conclude from evidence which showed repeated episodes of verbal and physical abuse and injuries that defendant Judy Bean committed this crime and did so knowingly. *Hill v. State,* (1983) Ind., 445 N.E.2d 994.

### III

■ Defendants claim that they were prejudiced by being represented jointly because there was a conflict of interest. In raising such an issue, the defendant must show that where there was no objection at trial, such as here, the joint representation resulted in actual prejudice. *Dean v. State,* (1982) Ind., 433 N.E.2d 1172, modified on other grounds, 441 N.E.2d 457; *Ross v. State,* (1978) 268 Ind. 608, 377 N.E.2d 634. In *Cuyler v. Sullivan,* (1980) 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333, the United States Supreme Court held that a trial court need not initiate an inquiry into joint representation unless it knows or reasonably should know that a particular conflict exists. *Id.* at 347, 100 S.Ct. at 1717, 64 L.Ed.2d at 346. *Cuyler* further held that to obtain relief on grounds of such conflict of interest, a defendant must show that an actual conflict of interest existed which affected the adequacy of his representation. *Id.* at 348, 100 S.Ct. at 1718, 64 L.Ed.2d at 346–47.

Defendants were not able to show any actual conflict of interest here nor to show that at any time they objected or implied to the trial court that they were being prejudiced by their joint representation and joint trial. Defendant Raymond and Judy Bean requested joint representation and a joint trial. Dollie Manns, one of the defense attorneys, testified at the hearing on the belated motion to correct errors that neither defendant ever requested a separate trial. In fact, she testified that both defendants insisted on being tried together when the attorneys raised the subject. Dollie Manns said the attorneys felt they had to raise the possibility of separate trials with the defendants because there was a better chance of Raymond being acquitted than there was of Judy. When they approached Raymond with this proposal, he said he never wanted to be separated from Judy at that time nor at any time; he wanted to go the "whole road" with Judy. Judy did not want to be separated from Raymond because she felt that, due to his poor education, he could not articulate what happened in the house. Raymond added he did not want to be separated from Judy because he thought of Judy as his spokesman. Both of them insisted at every step that they wanted to go to trial as soon as possible and get it over with, and they

wanted to do so together. There is no showing that any of the evidence that helped one defendant hurt the other. Defendants do not show they were prejudiced in any way by the fact that they were tried and represented together, nor did they ever indicate in any manner during the trial that they felt that they were. There is no merit to this issue.

## IV

Defendants next contend that they were denied effective representation of counsel. To sustain their contentions on this issue, the defendants cite about 150 alleged mistakes, each of which they admit was a little mistake but taken as a whole, illustrate the incompetency of counsel. The mistakes concern such things as the State's use of leading questions in interrogating witnesses without objections by defense counsel; incorrect objections by defense counsel; objections not made when they should have been; and the form of evidentiary foundations for introducing evidence.

■ To obtain reversal on the basis of defense counsel's incompetency, the defendant must show that "what the attorney did or did not do made the proceeding a mockery of justice, shocking to the conscience of the reviewing court." *Price v. State*, (1980) Ind., 412 N.E.2d 783, 787. The standard on review is "implemented with the corollary presumption that counsel is competent; strong and convincing evidence must be presented in order to overcome the presumption." *Tessely v. State*, (1982) Ind., 432 N.E.2d 1374, 1375. We look to the entire record and to the totality of the circumstances to see if and how the defendant was harmed by the inadequacy of counsel. We do not speculate on what may have been the most advantageous strategy in a particular case, and isolated instances of poor strategy or bad tactics do not amount to ineffective representation unless, taken as a whole, the trial was a mockery of justice. *Hollonquest v. State*, (1982) Ind., 432 N.E.2d 37; *Baker v. State*, (1980) Ind., 403 N.E.2d 1069, *cert. denied* 449 U.S. 882, 101 S.Ct. 232, 66 L.Ed.2d 106.

■ Many of the alleged incidents can be considered *de minimus* in their importance to the entire trial and many of them can be considered nothing more than tactical endeavors by defense counsel. In reviewing this record, however, it is apparent that the defendants were well and adequately represented by their attorneys. Defense counsel obtained large amounts of discovery, they took many depositions, they raised many pretrial issues that were well handled, and they maintained a vigorous and aggressive style of cross-examination of State's witnesses. The State sums up the defendants' argument by stating that the defendants have demonstrated nothing but a few isolated examples of poor strategy in their assertion that their defense was incompetent. This appears to be true. Defense counsel in this case faced an array of witnesses that testified to a great deal of direct evidence implicating these defendants in their conduct toward Mary Ann Neely. It is apparent that the defendants were vigorously defended by their attorneys in a competent and more than adequate manner.

## V

■ On January 19, 1981, the defendants filed a Verified Motion for Change of Venue from the county. The defendants believed they would be unable to receive a fair trial in Monroe County because of prejudicial publicity. Articles from a local newspaper covering their arrests were submitted along with the motion. The defendants go on to argue, without specifically pointing to error in the present case, about juror reluctance to set aside preconceived notions of guilt or innocence. The State properly points out that the issue to be determined by the trial court in seating a jury against claims of prejudicial publicity is not whether there is exposure to facts, for jurors need not be totally ignorant of the facts involved, but whether the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Irvin v. Dowd*, (1961) 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642, 6

L.Ed.2d 751, 756; *Williams v. State*, (1979) 270 Ind. 426, 429, 386 N.E.2d 670, 672.

The defendants do not show any evidence indicating a prejudicial and antagonistic atmosphere existed in the local community. The newspaper articles related the circumstances surrounding the arrest of the Beans. There is no showing of any editorial attempt to prove the Beans guilty before they were tried. No reference is made at all to the *voir dire* examination to show how many jurors, if any, had read the articles or had formed any opinion about the guilt or innocence of the defendants. The defendants have failed to show that the trial court erred in denying the motion for change of venue.

## VI

■ Finally, the defendants claim the trial court erred when it refused to conduct a hearing on their motion alleging jury misconduct. The alleged misconduct was directed to the manner in which the jury deliberated and arrived at its verdicts. Defendants claim that the jurors should have been called and questioned as to the manner in which they deliberated and arrived at the guilty verdicts.

There probably is no more well-settled law in Indiana than the law establishing that a verdict may not be impeached by testimony of the jurors who return it. *Bryant v. State*, (1979) 270 Ind. 268, 385 N.E.2d 415; *Stinson v. State*, (1974) 262 Ind. 189, 313 N.E.2d 699. We are often asked to re-examine this position and, without exception, we reaffirmed this holding. Perhaps the best rationale for this rule was given by Chief Justice Givan in *Stinson, supra*, 262 Ind. at 198, 313 N.E.2d at 704:

"If this Court were to permit individual jurors to make affidavits or give testimony disclosing the manner of deliberation in the jury room and their version of the reasons for rendering a particular verdict, there would be no reasonable end to litigation. Jurors would be harassed by both sides of litigation and find themselves in a contest of affidavits and counter-affidavits and arguments and re-ar-

guments as to why and how a certain verdict was reached. Such an unsettled state of affairs would be a disservice to the parties litigant and an unconscionable burden upon citizens who serve on juries."

The judgment of the trial court is affirmed.

GIVAN, C.J., and DeBRULER, HUNTER and PRENTICE, JJ., concur.