STATE OF NORTH CAROLINA v. BETTY LOU EVANS

No. 847SC812

(Filed 2 April 1985)

**Parent and Child § 2.2; Homicide § 21.9— death of child—involuntary manslaughter—sufficiency of evidence**

The State's evidence was sufficient to support defendant's conviction of involuntary manslaughter of a two-year-old child where it tended to show that the child had been left in the custody of defendant and her husband some four days prior to her death; the child had no bruises or scratches at that time; the child was seen approximately five hours before her death by a witness who testified that the child looked fine and was walking normally; defendant had exclusive custody of the child during the five hours prior to her death; examination of the child revealed numerous recent bruises and scratches probably received within twelve hours of death; an autopsy indicated a subdural hematoma, or bleeding inside the child's skull, probably caused by violent shaking; and the hematoma was a significant cause of death.

Judge BECTON dissenting.

APPEAL by defendant from *Allsbrook, Judge.* Judgment entered 7 March 1984 in NASH County Superior Court. Heard in the Court of Appeals 8 March 1985.

Defendant was indicted for involuntary manslaughter in the death of a two year old child. The state's evidence tended to show

the following: the child's mother left the child with defendant and her husband while away on a week-long trip. Defendant had cared for the child on numerous prior occasions. The child had no bruises or scratches when placed in defendant's care on 6 August 1983. Another witness saw the child on the morning of 10 August 1983 when defendant dropped her husband off at work; the child appeared fine and was walking normally, and the witness noticed no injuries. Defendant brought the child to the hospital about five hours later, after the baby stopped breathing. Defendant told police at the hospital that the child beat its head against the crib through the previous night. She stated that she noticed something was wrong when the child woke up briefly after an afternoon nap. Defendant also stated that no one else had had access to the child during the day. Examination of the child revealed numerous recent bruises and scratches, probably received within twelve hours of death. The state presented one medical expert, a pathologist. His autopsy indicated a subdural hematoma, or bleeding inside the child's skull, probably caused by violent shaking. The hematoma was a significant cause of death.

Defendant presented no evidence directly. Her evidence on cross-examination tended to show that her relationship with the child was very loving, and that she and her husband had offered to adopt the child. In addition, the child was suffering at the time of death from severe malnutrition of a longstanding nature, as well as being severely dehydrated, although the dehydration could have occurred within periods of as little as twelve hours. Dehydration alone might have been fatal, but the pathologist had no prior body weight from which to compute percentage loss of body fluid and therefore could express no opinion as to the actual threat. The pathologist could not isolate any single factor, including the hematoma, as the cause of death.

The jury returned a verdict of guilty, and defendant received the presumptive sentence. Defendant appealed.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General George W. Boylan, for the State.*

*Henson, Fuerst & Willey, P.A., by Ralph G. Willey, III, for defendant.*

WELLS, Judge.

Defendant argues only one assignment of error, challenging the denial of her motions to dismiss the charges against her. She argues several questions under the one assignment.

The evidentiary principles governing motions to dismiss are set out at length in *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982). Briefly summarized, they are that the evidence must be considered in the light most favorable to the state, with the benefit of all permissible favorable inferences. If the trial judge finds substantial evidence, regardless of weight, of each essential element of the crime, and that defendant committed it, the motion should be denied. Defendant's evidence, unless favorable to the state, is not considered.

Defendant argues that the state, having introduced uncontradicted evidence of her exculpatory statement that the child had beat her head on the crib, was bound by it. The state would only be bound by such a statement, however, if it could produce no other evidence tending to throw a different light on the death. *State v. Wooten*, 295 N.C. 378, 245 S.E. 2d 699 (1978); *State v. Bright*, 237 N.C. 475, 75 S.E. 2d 407 (1953). The state need not produce any single circumstance flatly contradicting the defendant, but may contradict the exculpatory statement using the totality of the circumstances adduced. *State v. Wooten, supra.* The nature of this type of case, in which the victim, even if he or she survives the assault, likely cannot testify thereto, renders such a rule practical and necessary. *See State v. Smith*, 40 N.C. App. 72, 252 S.E. 2d 535 (1979). *See also Marshall v. State*, 646 P. 2d 795 (Wyo. 1982) ("only one can talk"). There was ample circumstantial evidence establishing some assaultive behavior, and expert opinion testimony that the fatal injuries were not self-inflicted. This sufficed to contradict defendant's statement.

Along the same lines, defendant argues that her motion should have been granted, since the evidence establishes other equally credible theories of the cause of death. This argument simply restates a no longer valid premise, that circumstantial evidence must exclude every reasonable hypothesis other than guilt to go to the jury. Whatever conflict in authority remained on this issue was settled in *State v. Jones*, 303 N.C. 500, 279 S.E. 2d 835 (1981). To the extent that *State v. Langlois*, 258 N.C. 491,

128 S.E. 2d 803 (1963) relied on the questioned premise, it appears to have been overruled by *Jones. See State v. Smith, supra* (questioning *Langlois*). We also note that *Langlois* antedated our current child abuse laws and judicial recognition of the "battered child" problem. *See* N.C. Gen. Stat. § 14-318.2 (1981); *State v. Fredell,* 283 N.C. 242, 195 S.E. 2d 300 (1973); M. Thomas, *Child Abuse and Neglect Part II: Historical Overview, Legal Matrix and Social Perspectives on North Carolina,* 54 N.C.L. Rev. 743, 767-74 (1976). The only sort of modern case we have found calling for application of a rule that the state exclude all reasonable hypotheses inconsistent with guilt is one where the state presents no evidence that the accused was present at the scene of the crime. *See State v. Morton,* 230 Kan. 525, 638 P. 2d 928 (1982). Such was not the case here. The evidence showed that defendant had observed the victim through the previous night and had exclusive custody of the victim during the five-hour period following her last appearance as a healthy child, and that the fatal injuries were very recent, inflicted within the last twelve hours. This sufficed to take the case to the jury.

Even if we accept *Langlois* as authoritative we conclude that it is distinguishable on its facts. There the victim died as a result of a single hard blow administered some 24 to 48 hours prior to death. The evidence linking defendant to the act consisted only of a general pattern of punishment. Exclusive control of the infant was not established. Here, on the other hand, the state's evidence showed a fatal combination of recent injuries administered while the victim was in defendant's custody, including exclusive custody in the five hours before death. The child had been seen beforehand by someone who was familiar with her and who testified that she looked fine and was walking normally. *Langlois* does not control.

Our adherence to *Jones* also means we reject defendant's contention that the state had to exclude the possibility that death may have resulted from the infant's long-term weakened condition. It is well established that a preexisting physical condition, but for which the allegedly criminal conduct would not have been fatal, does not excuse criminal responsibility. *State v. Luther,* 285 N.C. 570, 206 S.E. 2d 238 (1974) (heart attack brought on by assault); *see also State v. Atkinson,* 298 N.C. 673, 259 S.E. 2d 858 (1979) (victim a "walking bombshell"); *State v. Alford Jones,* 290

N.C. 292, 225 S.E. 2d 549 (1976) (intervening negligence in treatment no excuse). This rule is particularly apposite in cases like the present one, where the accused has some control of the physical well-being of the decedent.

Finally, defendant attacks the evidence causally connecting the child's injuries and death. The pathologist testified positively for the state that the child's numerous injuries were not self-inflicted, that the child would not have died but for them, and that the subdural hematoma was a significant cause of death. He testified that the hematoma could have been caused by violent shaking causing tearing of the blood vessels between the dura and the brain, adding that death could result either from swelling of the brain or from rapid trauma to the brain from alteration of the blood supply. This testimony was properly admitted. *State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978). It sufficed to take the state's case on causation to the jury. *State v. Earnhardt, supra.* The fact that the pathologist could not definitely identify the hematoma as the cause of death does not negate his testimony. *State v. Luther, supra.* Nor does the pathologist's inability to describe exactly the attack that produced the hematoma negate his testimony. *State v. Lane*, 39 N.C. App. 33, 249 S.E. 2d 449 (1978) (similar facts; pathologist testified shaking "could" cause hemorrhage, but could not exclude other possibilities). These aspects of the expert testimony went to the weight of the testimony, not to its sufficiency. *State v. Reynolds*, 307 N.C. 184, 297 S.E. 2d 532 (1982). Defendant's reliance on the lack of edema, or swelling, of the brain focuses inordinately on one isolated part of the pathologist's testimony, ignoring his opinion that the probable cause of death was a combination of intentional injuries culminating in a rapid trauma to the brain induced by violent shaking.

We conclude that the motion to dismiss was correctly denied. Our review of recent cases in North Carolina and other states lends support. As noted above, we have already affirmed one conviction on similar evidence. *State v. Lane, supra.* We have also affirmed a conviction on similar medical evidence ("could cause" hemorrhage) coupled with admission of beatings. *State v. Vega*, 40 N.C. App. 326, 253 S.E. 2d 94, *disc. rev. denied and appeal dismissed*, 297 N.C. 457, 256 S.E. 2d 809, *cert. denied*, 444 U.S. 968 (1979). The decision of our supreme court in *State v. Byrd*, 309

N.C. 132, 305 S.E. 2d 724 (1983), reversing a similar conviction, is distinguishable: there the state relied on evidence that *another* child was abused, questions of access to the child were unclear, and the examining pathologist concluded death resulted from natural causes.

Decisions of other states reflect a general rule that it is not necessary to prove exactly which blow is fatal as long as the prosecution establishes (1) a pattern of violent behavior towards the child, or exclusive control, (2) a pattern of non-accidental injuries, and (3) probability of death from such injuries. *See State v. Vega, supra; State v. Lane, supra; State v. Austin*, 84 S.Dak. 405, 172 N.W. 2d 284 (1969); *State v. Morton, supra; Fiorot v. State*, 641 P. 2d 551 (Okl. Crim.), *cert. denied*, 456 U.S. 1011 (1982); *State v. Abram*, 537 S.W. 2d 408 (Mo. 1976); *State v. Felo*, 454 So. 2d 1150 (La. App. 1984); *State v. Durand*, 465 A. 2d 762 (R.I. 1983); *Bean v. State*, 460 N.E. 2d 936 (Ind. 1984). This case fits this general rule. And the theory of cause of death here, violent shaking, resulting in subdural hematoma, has been accepted as legally sufficient in other cases. *State v. Lane, supra; State v. Austin, supra; see also State v. Durand, supra* (no direct evidence of cause of hematoma; substantial evidence negated accident, conclusion that sole custodian inflicted injury "flows logically from the totality of the circumstances").

Defendant's motions to dismiss were properly denied. We conclude that she received a fair trial, free of prejudicial error.

No error.

Judge WHICHARD concurs.

Judge BECTON dissents.

Judge BECTON dissenting.

In this death of a two-year-old child case, believing that the State failed to establish "(1) a pattern of violent behavior towards the child or exclusive control, (2) a pattern of non-accidental injuries, and (3) probability of death from such injuries," ante p. 7, I dissent.

First, and summarily, I find the evidence of "causation" close, but insufficient to take the case to the jury. The majority relies

on *State v. Earnhardt,* 307 N.C. 62, 296 S.E. 2d 649 (1982), *State v. Wilkerson,* 295 N.C. 559, 247 S.E. 2d 905 (1978), and *State v. Lane,* 39 N.C. App. 33, 249 S.E. 2d 449 (1978); however, I find those cases inapposite.

My second, and more substantial, reservation about the majority's result involves what I believe to be a flawed premise by the majority—"The evidence showed that defendant had observed the victim through the previous night and had exclusive custody of the victim during the five-hour period following her last appearance as a healthy child, . . . [and that] the state's evidence showed a fatal combination of recent injuries administered while the victim was in defendant's custody, including exclusive custody in the five hours before death." Ante pp. 4-5. Assuming, *arguendo,* that the child was seen by State's witness Edel Elsayed on 10 August 1983,[1] five hours before her death,

---

1. The assumption is made because on nonsuit the evidence must be taken in the light most favorable to the State. The witness, Elsayed, was equivocal, however, as is evidenced by excerpts from his testimony:

Q. All right; how many times before had you seen that little girl?

A. Once in a while, a week, you know, like, not every week, once in awhile week, you know, she kept her like babysitter, you know.

Q. So, you'd seen the child several times before?

A. Uh huh.

Q. Are you sure that you saw this child . . . prior to August 10th, when had you last seen this child?

A. That's last time I saw her.

Q. How are you able to remember that you saw this child particularly on August 10, 1983?

A. I saw her, you know, she's fine, she's walking with her, you know.

Q. Was there anything unusual about that particular day to you?

A. No, because I see, you know like somebody coming and going I watch, that's my job, collecting rent. If somebody come [sic] in office [sic] something like that, you know.

Q. Are you sure about the date?

A. The date.

Q. That you saw this child?

A. Same date.

Q. Are you sure it was not Wednesday August 3rd rather than the 10th that you saw this child?

Elsayed's testimony does not aid the State measurably. Even conceding the majority's point that "[t]he child had been seen beforehand by [Elsayed] who was familiar with her and who testified that she looked fine and was walking normally," ante p. 5, Elsayed, himself, testified that the child was clothed when he saw her and was holding the defendant's hand as she walked. An excerpt from the actual direct examination of Elsayed follows:

Q. Can you describe the appearance of the little girl that morning, what did she look like?

A. She's fine, she walk with her hand, you know.

Q. Excuse me?

A. She catch his hand, she walk with him.

Q. Speak louder so we can hear you.

A. She walk, she was walk [sic] with him, you know.

Q. And, held someone's hand?

A. Yeah.

Q. Whose hand was she holding?

A. Betty.

---

A. Wednesday in the morning, about nine thirty, ten o'clock.

Q. You remember it was on a Wednesday?

A. I believe.

Q. You believe?

A. (No response.)

Q. Are you sure whether or not it was a Wednesday?

A. I'm not sure about the date, you know, but I, you know, some man keep [sic] coming and ask me, you know, some officer. I forgot his name, police officer, detective or whatever.

Q. But, you're not sure of the date?

A. I'm not sure, you know, about the date. I remember about the day, whatever, you know, Wednesday, or Thursday, whatever, you know.

Q. But, you're not sure about the date at all?

A. No, I'm not sure about the, I [sic] have to go look at a calendar and read you for that day.

Q. And, you'd seen the child several other times as well?

A. Uh huh.

State v. Evans

Q. This lady over here (indicating)?

A. Uh huh.

Q. Betty Evans?

A. Uh huh.

Q. How was the little girl acting?

A. Okay, she catch her hand and she walk with her, that's it.

Q. Did she have any injuries?

A. What you mean injuries?

MR. WILLEY: OBJECTION.

COURT: OVER-RULED.

Q. Did you see any marks—

A. Mark?

Q. —on the baby, on the little girl?

A. She had on clothes, I can't see.

Q. Did you see her face?

A. Yeah, face was fine.

Q. Was anything wrong with her face?

A. Uh uh.

Q. I'll hand you what's been marked for identification as State's Exhibit #1—

A. Uh huh.

Q. —can you tell us what that is?

A. It's a girl but I know, you know, because she come and go, you know, I can, like, you know, it's regular, like somebody coming in and going and looking just coming here and she left.

Q. Is that the same little girl you saw that morning—

A. Uh huh.

Q. —with Betty Evans.

MR. WILLEY: OBJECTION, Your Honor.

A. Uh huh.

COURT: OVER-RULED.

Q. It is?

A. Uh huh.

MR. SYKES: Thank you, that's all the questions I have.

Nothing about this testimony convinces me that the State has carried its burden. This is still a "who done it" case. Did the defendant's husband or some other person cause the subdural hematoma by violently shaking the child *before* she was seen by Elsayed? I find no evidence in the record that the child would have died immediately after having been shaken, or would not have been able to walk while holding someone's hand after having been violently shaken. Significantly, the State's expert witness, Dr. Levy, testified not that the injuries were inflicted within five hours of the child's death, but rather, within twelve hours. In responding to the district attorney's question about the age of the injuries, including the subdural hematoma, suffered by the child, Dr. Levy testified: "I formed the opinion that because of the things that I saw microscopically, that they all happened in a very short period of time prior to death, probably in the order of less than twelve hours. Being more specific is very difficult, almost impossible." Consequently, based on the above, and considering that the defendant did not admit shaking the child as was the case in *State v. Lane*, a case relied on by the majority, I believe defendant's *motion to dismiss* should have been allowed. I therefore vote to reverse.