STATE OF NORTH CAROLINA v. JAMES EDWARD WOOTEN

No. 38

(Filed 14 July 1978)

1. **Homicide § 21.6— murder in perpetration of robbery —sufficiency of evidence**

    In a first degree murder prosecution, evidence that defendant killed deceased while committing or attempting to commit a robbery was sufficient to be submitted to the jury where it tended to show that, immediately prior to deceased's death, defendant was short of money, unable to afford food or heat for his apartment; shortly after deceased's death, defendant purchased groceries and clothing, paid $85 for heat, treated his housemates to a night at the State Fair, and offered a friend $200 cash as down payment for a car; when defendant went to a nightclub, the scene of the crime, he parked his vehicle at the side of the club, out of sight of the front entrance, though the

parking lot was virtually empty and there was space to park by the club's front entrance; when he walked to the entrance of the club defendant carried a blackjack with him; shortly after deceased's death defendant explained his newly acquired wealth to a housemate by saying he had seen "a friend that owed him some money and the friend wouldn't give it to him and he had to take it"; on his second trip to the club, immediately after gathering up various objects from around deceased's body, defendant drove to a lake and threw "an armful of stuff" into the lake, but he did not throw deceased's pistol or money into the lake; defendant's avowed purpose for making his second trip to the club was the elimination of evidence tending to connect him with deceased's death, but his action in retaining possession of deceased's money and pistol was inconsistent with this purpose; and defendant's own statement tended to show that he took deceased's pistol immediately after killing him.

**2. Homicide § 17— murder in perpetration of robbery—intent—evidence improperly excluded—no prejudice**

In a prosecution for murder committed during the perpetration of a robbery, the trial court erred in refusing to permit defendant to testify that he had no intention of robbing or harming deceased when he went to a nightclub, the scene of the crime, but such error was not prejudicial to defendant since the jury was made aware by other testimony that defendant's intention in going to the club was to see his wife, who was an employee there, to talk to her about her upcoming surgery, and that his intention was not to rob deceased, the proprietor of the club.

DEFENDANT appeals from judgment of *Godwin, J.,* entered at the 8 August 1977 Session, WAKE Superior Court.

Defendant was tried upon a bill of indictment charging him with the first degree murder of Bernest H. Tucker.

The State's evidence tends to show that at 7:45 a.m. on Thursday, 21 October 1976, the lifeless body of Bernest Tucker was discovered lying in front of his car in the parking lot of The Entertainer Club near Gresham's Lake. Mr. Tucker had been shot twice in the left chest, one of the two shots passing completely through his body. Decedent had also been struck over the head repeatedly with a blunt object. His skull had been fractured and, in the opinion of State's expert witness Dr. Gordon LeGrande, the blow which caused the fracture was sufficient to cause unconsciousness. A number of decedent's ribs were broken, apparently as the result of having been run over by a motor vehicle. An autopsy showed the ribs had been broken at a time when Mr. Tucker was already dead and that the cause of death was bleeding resulting from the two gunshot wounds. An analysis of Tucker's blood revealed .11 percent alcohol.

The State's evidence further tends to show the following:

1. The front door of The Entertainer Club was unlocked and the parking lot lights had not been turned off. It was customary for Mr. Tucker, the club's proprietor, to lock the door and turn off the parking lot lights at the close of business for the evening.

2. Footprints made by someone wearing work shoes were found leading to the body. A comparison of these prints with boots belonging to defendant and obtained during a search of his apartment disclosed that the prints were made by defendant's shoes. The shoes were stained with type A human blood. Mr. Tucker's blood was type A, defendant's is type B.

3. Tire tracks spotted with blood were found on each side of Bernest Tucker's body. Subsequent examination of a borrowed pickup truck which had been in defendant's possession on 21 October disclosed that the width of the tire tracks was identical to the width of the wheel base of the pickup truck and that the size and design of the tracks corresponded to the size and design of the truck's tires. Examination of the truck also showed the presence of human blood on its right side and undercarriage.

4. Footprints made by someone wearing tennis shoes were found in the immediate area surrounding the body. These footprints did not lead off in any direction but pointed in several different directions and were found only in the immediate vicinity of the body. Tennis shoes belonging to defendant matched the prints with respect to size, tread design and wear but could not be positively identified as the shoes which made the tracks.

5. Two .38 caliber bullets were recovered, one from Tucker's body and one from the ground where his body lay. These bullets had been fired from a .38 caliber Colt revolver which belonged to decedent and which he customarily kept in his car or in the office at The Entertainer Club, or carried with him when going between car and office. This gun was recovered from a stream in Johnston County by police officers who were directed to its location by defendant.

6. On 25 October 1976, pursuant to a search warrant, officers searched defendant's apartment. In addition to the work boots and tennis shoes previously referred to, officers recovered a quantity of cash and four small brown paper bags. Three of these bags bore writing. One contained a quantity of coins. One of the bags

was positively identified as a bag used to keep money received from the operation of The Entertainer Club; the others were similar to bags used for this purpose, and two bore handwriting similar to Mr. Tucker's. It was customary for Mr. Tucker to carry such bags containing the night's cash receipts with him at the time he closed the club for the evening. These small brown paper bags were customarily placed in blue plastic zipper bags. These blue plastic zipper bags were then in turn customarily put into a white canvas bag which Mr. Tucker carried with him when he closed the club.

7. Also recovered as a result of the search of defendant's apartment was a blackjack approximately one foot in length. This blackjack belonged to Clinton Hinton, the man who owned the pickup truck which defendant borrowed during October, and had been kept with the truck. When found at defendant's apartment it bore bloodstains of undetermined origin.

8. Defendant was arrested on 25 October 1976, advised of his rights, and questioned concerning the death of Bernest Tucker. As a result of this questioning defendant made a statement substantially as follows: He drove to The Entertainer Club at approximately 1:30 a.m. on 21 October for the purpose of meeting and talking with his wife who was employed there. Bernest Tucker's Cadillac was parked near the entrance to the nightclub and another vehicle was parked nearby. Someone was "bending down" in front of Tucker's Cadillac and this person fled at defendant's approach. Defendant drove around the Cadillac to where the figure had been crouched and inadvertently drove over Tucker's body. Defendant got out of the pickup truck he was driving, picked up Tucker's body, realized Tucker was dead, panicked, inadvertently backed the truck over Tucker's body and fled. When defendant arrived at his apartment he changed his clothes and put on tennis shoes. He then realized he had dropped his cigarette lighter and cigarettes by Mr. Tucker's body and drove back to The Entertainer Club to retrieve them. At this time Mr. Tucker's Cadillac was the only vehicle in the parking lot. In response to specific questioning, defendant stated that on neither trip did he take anything from the crime scene other than his cigarette lighter and cigarettes, which he retrieved on his second trip.

9. Defendant was informed by the officers that the evidence they had obtained contradicted his story. After a brief interlude

defendant made a second statement in which he said: He went to The Entertainer Club to see his wife who was employed there. Defendant arrived at the club at approximately 1:30 a.m. and parked the pickup truck he was driving. In his pocket he carried the nightstick from the truck. (Since he had been robbed in Virginia some time earlier he had always carried a nightstick with him for defensive purposes.) Defendant walked to the club entrance where he encountered Mr. Tucker who was attempting to lock the door. Tucker seemed to be intoxicated. Defendant inquired concerning the whereabouts of his wife. Mr. Tucker responded by saying that he — Tucker — was now caring for her. An argument ensued, Tucker drew a gun and struck defendant on the back of the head, knocking him to the ground. Tucker stood over defendant and stated he was going to kill him. Defendant grabbed the gun and the two men struggled and wrestled, each attempting to gain control of the firearm. Defendant removed the nightstick from his back pocket and hit Tucker on the head repeatedly during the struggle. The gun fired during the scuffle but Tucker still did not release the weapon and defendant continued to attempt to wrest it from Tucker's control. The gun fired. Defendant jumped up, ran to his truck and drove off. In his haste and confusion he inadvertently ran over Tucker. Defendant drove to his residence where he changed clothes, took off his work boots and put on tennis shoes. He then realized he had left his cigarette lighter and cigarettes at the scene of the shooting. He drove back to The Entertainer Club, found his lighter and cigarettes, and also picked up numerous other items, including "a rectangular-shaped white item that contained three blue bags, vinyl type." Defendant then drove to nearby Gresham's Lake and threw several items into the water. Later on 21 October he drove down a dirt road in Johnston County where he disposed of the gun and the pants he had worn during his struggle with Mr. Tucker.

In response to officers' questions, defendant stated that the first time he remembered seeing the small brown paper bags found in his apartment was when he discovered them on the seat of the pickup truck during the daytime on the morning of October 21.

10. After making this second statement defendant directed the officers to a dirt road in Johnston County where the gun

which had fired the shots that killed Tucker was recovered. Also recovered was a pair of pants identified as belonging to defendant. These pants were stained with type A human blood.

11. Defendant was provided with writing materials and wrote out an eight-page statement which was substantially in agreement with his second statement summarized above. In this written statement defendant said he drove back to The Entertainer Club after the killing because he thought he had lost his cigarettes and cigarette lighter, billfold and keys during the altercation. The written statement describes defendant's return trip to the nightclub as follows:

". . . I got to the club and Mr. Tucker was still laying there. . . .

As I bent over Mr. Tucker crying, something happened to me. It's like my mind and body went blank. All I know was I had to get away, and then it hit me what I was there for, so I started picking up everything that was laying on the ground. . . . I picked up everything I could see. I even picked up some small rock.

The next thing I remember was I was standing at Gresham's Lake. I had an armful of stuff, so I just threw it into the lake. . . .

I don't remember bringing the gun in the house or the money. I do remember when I went back the second time, there was little bags of money laying on the ground, but I don't remember putting them in my pockets, or the gun. . . .

I thought I throwed the gun and money in Gresham's Lake."

12. Other evidence introduced by the State tended to show that defendant's wife was in fact employed at The Entertainer Club, though she did not generally work on Wednesdays, and that she had been at the club "for the better part of the evening" on Wednesday, October 20.

At the close of the State's evidence defendant's motion to dismiss the charge against him was denied. Defendant then testified in his own behalf. His testimony tends to show that in the early morning hours of 21 October defendant was highly in-

toxicated as the result of drinking beer and liquor and smoking marijuana. After visiting several other nightclubs, he drove to The Entertainer Club where he hoped to meet and talk with his wife who was employed there. He arrived just as Mr. Tucker was attempting to lock the front door of the club and inquired about his wife's whereabouts. Tucker told him her whereabouts were none of his business. In further conversation Tucker referred to defendant's wife as a whore and stated that defendant had "destroyed his plans" by moving from Washington, D. C. back to Raleigh. Defendant and Tucker argued. Tucker then drew a gun and with it struck defendant on the back of his head several times. Defendant attempted to disarm Tucker and the two men fell to the ground. Defendant drew the nightstick from his back pocket and, as the two men struggled over the gun, attempted to hit Tucker. During the struggle and while defendant did not have control of the gun, it discharged again, and Tucker then released it.

Defendant left Tucker's body and walked to the pickup truck where he vomited. He then drove off, inadvertently driving over Tucker who was not yet dead and who shouted "I'll kill you." When he arrived at his residence defendant washed, changed clothes and put on a pair of tennis shoes. He then realized he could not locate his cigarettes, cigarette lighter, wallet or keys. Defendant drove back to The Entertainer Club, saw a number of articles, including bank bags, lying near Tucker's body, picked up "just about everything [he] saw," drove to nearby Gresham's Lake and threw a number of objects that he'd picked up into the water. He then drove back to his apartment and took Tucker's pistol and some brown paper bags inside. Later that morning defendant drove to Johnston County where he disposed of the pistol and the pair of pants he'd been wearing when he fought with Tucker.

Defendant sought to testify that when he first went to The Entertainer Club he had no intention of robbing or harming Mr. Tucker. Upon the State's objection, however, this testimony was excluded.

Defendant also presented several witnesses who testified concerning his docile temperament and his behavior at times other than the night of October 20-21, 1976.

The trial court submitted the case to the jury under instructions that it could find defendant guilty of murder committed in

the perpetration of robbery, second degree murder, voluntary manslaughter, or could find him not guilty. The jury found defendant guilty of first degree murder and he appealed, assigning errors as noted in the opinion.

*Rufus L. Edmisten, Attorney General, by Donald W. Grimes, Associate Attorney, for the State of North Carolina.*

*Gerald L. Bass, Attorney for defendant appellant.*

HUSKINS, Justice.

[1] By his first assignment defendant contends the trial court erred in denying his motion for judgment as of nonsuit and submitting the issue of his guilt of first degree murder to the jury.

The record reveals that the State proceeded on the theory that defendant killed Tucker while robbing him, *i.e.*, felony murder; this was the only theory of first degree murder submitted to the jury. Defendant argues that there was no evidence tending to show he killed Tucker while committing or attempting to commit a robbery. On the contrary, defendant contends all the evidence, including his own extrajudicial statements which were put into evidence by the State, tends to show that he made two trips to The Entertainer Club in the early morning of 21 October 1976; that he killed Tucker during the first trip; and that he stole property belonging to Tucker only on the second trip, several hours later, when he returned to the club for the purpose of eliminating evidence which might implicate him in Tucker's death. We find no merit in this contention.

G.S. 14-17, insofar as pertinent to the present case, provides: "A murder . . . which shall be committed in the perpetration or attempted perpetration of any . . . robbery . . . shall be deemed to be murder in the first degree. . . ." In order to support defendant's conviction of first degree murder, the evidence taken in the light most favorable to the State must be adequate to support a legitimate inference that defendant killed Tucker while robbing or attempting to rob him, *i.e.*, that the killing was part of the *res gestae* of the robbery or attempted robbery. *State v. Squire*, 292 N.C. 494, 234 S.E. 2d 563 (1977). A killing is committed in the perpetration or attempted perpetration of another felony when there is no break in the chain of events between the felony and the act causing death, so that the felony and homicide

are part of the same series of events, forming one continuous transaction. *State v. Squire, supra; State v. Shrader,* 290 N.C. 253, 225 S.E. 2d 522 (1976); *State v. Thompson,* 280 N.C. 202, 185 S.E. 2d 666 (1972). If there is evidence tending to show that defendant took property belonging to Tucker immediately after killing him, such evidence would support a jury determination that the killing occurred during the perpetration of a robbery. *See, e.g., State v. Rich,* 277 N.C. 333, 177 S.E. 2d 422 (1970). If, on the other hand, there is no evidence tending to show that defendant went to The Entertainer Club with the intent to rob Tucker, and there is no evidence tending to show that defendant took Tucker's property during the same continuous series of events that resulted in Tucker's death, defendant could not be convicted of first degree murder under the felony-murder doctrine.

On defendant's motion for judgment as of nonsuit the evidence must be considered in the light most favorable to the State — all contradictions and discrepancies are to be resolved in the State's favor, and the State is entitled to every favorable legitimate inference arising from the evidence. *E.g., State v. Cutler,* 271 N.C. 379, 156 S.E. 2d 679 (1967). When the evidence in the present case is so considered, we hold it is adequate to support the jury's finding that defendant killed Tucker while engaged in a robbery or attempted robbery. Our conclusion is based on the following evidentiary matters which tend to support the State's theory of felony-murder:

1. Immediately prior to Tucker's death defendant was short of money, unable to afford food or heat for the apartment in which he lived.

2. Shortly after Tucker's death defendant had enough money to purchase groceries and clothing, pay $87 for heat, treat his housemates to a night at the State Fair, and offer a friend $200 cash as a down payment for the purchase of a car.

3. When defendant went to The Entertainer Club on the night of October 20-21, 1976, he parked the vehicle he was driving at the side of the club, out of sight of the front entrance, even though the parking lot was virtually empty and there was space to park by the club's front entrance.

4. When he walked to the entrance of the club defendant carried a blackjack with him.

5. Shortly after Tucker's death defendant explained his newly acquired wealth to a housemate by saying he had seen "a friend that owed him some money and the friend wouldn't give it to him and he had to take it."

6. On the second trip to The Entertainer Club, immediately after gathering up various objects from around Tucker's body, defendant drove to nearby Gresham's Lake and threw "an armful of stuff" into the lake. Apparently all objects defendant took from the nightclub's parking lot except Tucker's money and pistol were thrown into the lake. Defendant offered no explanation why, if Tucker's money and pistol were taken on this second trip, he did not dispose of these items in the same manner.

7. Defendant's avowed purpose in making the second trip to The Entertainer Club was the elimination of evidence tending to connect him with Tucker's death. His action in throwing objects picked up from the club's parking lot into Gresham's Lake was consistent with this purpose. His action in retaining possession of Tucker's money and pistol was inconsistent with this purpose, and their retention tends to support the State's theory of felony-murder.

8. Defendant's own statement tends to show that he took Tucker's pistol immediately after killing him. In his written statement, introduced by the State, defendant described the conclusion of his struggle with Tucker as follows: "And I finally got away from him [Tucker]—and I finally got away from him with the gun in my hand. . . . I ran to the truck."

The evidence adduced at defendant's trial clearly shows that defendant killed Tucker and made off with Tucker's money and handgun. We think the evidence, taken in the light most favorable to the State, permits a legitimate inference that defendant was engaged in the perpetration or attempted perpetration of a robbery at the time Tucker was killed. The jury was entitled to draw this inference, notwithstanding the State's introduction of defendant's extrajudicial declarations in which he stated he killed Tucker in self-defense rather than in the course of a robbery. In *State v. Hankerson,* 288 N.C. 632, 220 S.E. 2d 575, *reversed on other grounds,* 432 U.S. 233, 53 L.Ed. 2d 306, 97 S.Ct. 2339 (1977), the State introduced into evidence defendant's extrajudicial statements which included assertions that the killing with which

he was charged was committed in self-defense. Justice Exum, writing for this Court, overruled defendant's contention that the charges against him should be dismissed. His reasoning there is pertinent here:

> "While none of these circumstances taken individually flatly contradicts defendant's statement, taken together they are sufficient to 'throw a different light on the circumstances of the homicide' and to impeach defendant's version of the incident. The State is not bound, therefore, by the exculpatory portions of defendant's statement. The case is for the jury."

288 N.C. at 638, 220 S.E. 2d at 581. Also *see State v. May*, 292 N.C. 644, 235 S.E. 2d 178, *cert. denied*, --- U.S. --- (1977); *State v. Bolin*, 281 N.C. 415, 189 S.E. 2d 235 (1972); *State v. McKnight*, 279 N.C. 148, 181 S.E. 2d 415 (1971); *State v. Cooper*, 273 N.C. 51, 159 S.E. 2d 305 (1968); *State v. Mangum*, 245 N.C. 323, 96 S.E. 2d 39 (1957); *State v. Bright*, 237 N.C. 475, 75 S.E. 2d 407 (1953). *See especially State v. Carter*, 289 N.C. 35, 220 S.E. 2d 313, *death sentence vacated*, 428 U.S. 904 (1976).

So it is here. The issue of defendant's guilt of first degree murder was properly submitted to the jury. Defendant's first assignment of error is overruled.

[2] By his second assignment defendant contends the trial court erred by sustaining objections to two questions asked of defendant on direct examination: (1) "Did you go out there [to The Entertainer Club] . . . with the intentions of robbing Mr. Tucker?" (2) "Did you go out there, Mr. Wooten, with the intent to harm Mr. Tucker?" The record shows that if permitted to answer, defendant would have answered "No" to each question.

As heretofore noted, the State proceeded on the theory that defendant killed Tucker while engaged in perpetration or attempted perpetration of a robbery. Intent to steal is an essential element of the crimes of robbery and attempted robbery. *State v. Spratt*, 265 N.C. 524, 144 S.E. 2d 569 (1965); *State v. Lunsford*, 229 N.C. 229, 49 S.E. 2d 410 (1948). It therefore follows that unless defendant was possessed of an intent to steal Bernest Tucker's property at the time Tucker was slain, defendant could not be convicted of first degree murder under the felony-murder doctrine. Defendant's own testimony regarding his purpose or inten-

tion in visiting The Entertainer Club was thus competent and relevant; the exclusion of this testimony was error. *See State v. Freeman*, 280 N.C. 622, 187 S.E. 2d 59 (1972).

Our examination of the record convinces us, however, that defendant suffered no prejudice as a result of the exclusion of this testimony. Defendant testified without objection that his purpose in going to The Entertainer Club was to meet his wife and talk with her about surgery which she was about to undergo. Deputy Sheriff John Stubbs, as a witness for the State, related the substance of two oral statements defendant made shortly after being arrested. Deputy Stubbs testified that in each of these statements defendant said his purpose in going to The Entertainer Club was to see and speak with his wife, Grace Wooten. The whole fabric of defendant's account of events which transpired at The Entertainer Club is entirely inconsistent with his having gone to the club for the purpose of robbing Bernest Tucker. Moreover, the trial court, in summarizing defendant's evidence, stated that defendant contended "he went [to the club] for the purpose of talking with [his wife Grace] about surgery that she had planned and which she was to undergo at some time in the near future."

Thus it is obvious that the jury was fully aware of defendant's contention that he went to The Entertainer Club to see his wife and not for the purpose of robbing Bernest Tucker. Under such circumstances the trial court's error in refusing to permit defendant to testify that he had no intention of robbing Bernest Tucker did not prejudice him. *State v. Sanders*, 276 N.C. 598, 174 S.E. 2d 487, *death sentence vacated*, 403 U.S. 948 (1971); *State v. Tyson*, 242 N.C. 574, 89 S.E. 2d 138 (1955). We are convinced that defendant's conviction did not stem from the fact that the jury was deprived of his testimony regarding his intentions; rather, the jury was fully aware of defendant's contentions and chose to believe the true facts were otherwise. Defendant's second assignment of error is overruled.

By his remaining assignments defendant contends the trial court erred in an evidentiary ruling, in making certain comments out of the presence of the jury, in instructions pertaining to reasonable doubt and self-defense and in suggesting to the jurors how they should go about considering the evidence presented. We

have considered these further exceptions and find no merit in any of them. No useful purpose would be served by discussing these assignments separately and reiterating principles of law well established by prior decisions of this Court.

We hold that defendant has received a fair trial, free from prejudicial error. The verdict and judgment must be upheld.

No error.