STATE OF NORTH CAROLINA v. RICHARD ANTHONY SANDERS AND STEVEN WALLACE SANDERS

No. 519A85

(Filed 12 August 1986)

**1. Jury § 7.7— challenge for cause—failure to preserve for appeal**

Defendants failed to comply with the requirements of N.C.G.S. § 15A-1214(h) and were not entitled to relief on appeal where they at no time sought to renew any of their previously denied challenges for cause; *State v. Watson,* 310 N.C. 384, did not imply that the former common law rule provides an alternative method of preserving such issues for appeal. Moreover, the issue arose in the selection of alternate jurors and the jurors who rendered the verdicts were acceptable to the State and to both defendants.

**2. Searches and Seizures §§ 35, 15— tennis shoes seized incident to arrest—no error**

The trial court did not err in a prosecution for murder, burglary and robbery by admitting tennis shoes seized when one defendant was arrested where the seizure was incident to a lawful arrest in that the shoes were discovered around the bed where defendant was standing when arrested, and the other defendant failed to show standing in that he had no possessory interest in the house or the room where the shoes were seized and was not present at the house when the first defendant was arrested and the shoes seized. N.C.G.S § 15A-972.

**3. Constitutional Law § 63— death qualified jury—constitutional**

   Defendants' rights to due process of law and trial by jury were not violated by a death qualified jury.

APPEAL by the defendants from judgments entered on 14 June 1985, by *Bowen, J.*, in Superior Court, ORANGE County.

Each defendant was convicted upon proper indictments of first degree murder, first degree burglary, attempted robbery with a firearm, and two counts of robbery with a firearm. The murder charges were tried as capital offenses. Because the jury based the first degree murder convictions on the theory of felony murder, the trial court stayed judgment on the armed robbery charges and the attempted armed robbery charges. At the conclusion of the penalty phase, the jury returned verdicts recommending that the defendants each be sentenced to life imprisonment for first degree murder. Following the jury's recommendation, the trial court sentenced each defendant to life imprisonment for murder. The trial court sentenced each defendant to imprisonment for fourteen years for burglary.

The defendants appealed their murder convictions and resulting life sentences to the Supreme Court as a matter of right. Their motions to bypass the Court of Appeals on their appeals of the burglary convictions were allowed by the Supreme Court on 8 January 1986. Heard in the Supreme Court on 9 June 1986.

*Lacy H. Thornburg, Attorney General, by Thomas J. Ziko, Assistant Attorney General, for the State.*

*Ann B. Petersen for the defendant-appellant Richard Anthony Sanders.*

*Malcolm R. Hunter, Jr., Appellate Defender, by David W. Dorey, Assistant Appellate Defender, for the defendant-appellant Steven Wallace Sanders.*

MITCHELL, Justice.

By their assignments, the defendants contend that the trial court made several errors. The defendants first contend that the trial court erred by refusing to dismiss a juror for cause. They next contend that the trial court erred by permitting the State to introduce a pair of shoes that were seized when the defendant

State v. Sanders

Steven Sanders was arrested. They also contend that the trial court erred by allowing the State to "death qualify" the jury.

The evidence presented at trial by the State tended to show, *inter alia*, that on 4 February 1985, Robert Wimberly was living in a mobile home with William Bullock and James Youngman at 35 Hilltop Mobile Home Court in Chapel Hill. Wimberly testified that Thomas Perry Zimmerman visited them at their home three or four times weekly. During the evening of 4 February 1985, the four men were in the mobile home. Wimberly, Bullock and Youngman had prepared supper. About 8:00 p.m. Wimberly was in the kitchen area. Bullock and Youngman were sitting in the den eating and watching television. Zimmerman was playing a guitar.

An intruder wearing a "dark colored mask" burst into the mobile home with an automatic pistol in his hand. He told everyone to get down on the floor and fired a shot through the roof of the trailer. He then said: "Where is it? Where is the stuff?" Wimberly testified that "everyone replied they didn't know what he was talking about." The intruder began hitting Wimberly over the head with a two-by-four board and asked: "Where is the stuff?" He also beat Youngman with the board and asked: "Where is the stuff?"

A second intruder then entered the mobile home. He was not wearing a mask and was later identified by Youngman as the defendant Steven Sanders. The intruders ransacked the home and found "an ounce of marijuana . . . ." They beat Wimberly with the two-by-four and demanded "the cocaine." Wimberly told them that he did not know "anything about any cocaine."

Wimberly testified that he recognized the voice of one of the intruders as that of the defendant Richard Sanders. Wimberly testified that when Richard Sanders first came in he was talking in a normal tone but later began speaking in a "real high squeaky tone like Mickey Mouse." The other defendant disguised his voice in a "whispered growl."

The defendants continued to search the mobile home for drugs and would periodically yell at Zimmerman: "I told you to quit looking at me, boy." Wimberly testified that "you'd hear the sound of the board hitting him in the head. And he would scream back: 'I'm not looking at you. I'm not looking at you.'" The de-

fendants took everyone's money and car keys. They made Wimberly specifically identify his car keys and his car and then left the mobile home.

A few minutes later Bullock asked: "Are you gone? Are they gone?" One of the defendants yelled from the rear of the trailer: "Hell no, we're not gone. We're going to kill you . . . ." Wimberly testified that: "then there was about a minute, two minutes of silence. The next thing I heard was a gun shot and Perry [Zimmerman] scream." The defendants then left. Zimmerman was lying on the floor with his face in a puddle of blood and was not moving. Wimberly "turned his head out of the puddle of blood so he could breath [sic] if he had been alive."

William Bullock corroborated Wimberly's testimony. He testified that the defendants hit him on the head with a two-by-four, and he could hear everyone else being hit on the head. He testified that the defendants kept saying to Zimmerman: "I told you not to look at me," and "he'd be hollering, 'I'm not looking at you. I swear I'm not.' Just crying mercy please don't kill me. Still kept getting hit." Bullock said that after Zimmerman was shot, he: "started breathing gargling air; and I assume it was a hole in his lungs . . . . You could hear blood mixed in with his breathing like he was gasping for air."

James Youngman testified and corroborated Wimberly's and Bullock's testimony. He identified the defendant Steven Sanders as the second intruder to enter the mobile home.

Dale Lunsford testified that on 4 February 1985, he lived one hundred feet from the crime scene. He came home at approximately 8:30 p.m. and heard a shot and "rustling" in the victims' mobile home. He also heard a "lot of footsteps, a lot of pounding."

William D. Carter, a Chapel Hill Public Safety Officer, testified that he lived at Hilltop Mobile Home Park on 4 February 1985. He heard a gunshot there "shortly after 8 o'clock."

John Butts, Associate Chief Medical Examiner for the State of North Carolina, performed an autopsy on the victim Zimmerman. In his opinion Zimmerman died as a result of a gunshot wound. The bullet entered the left side of Zimmerman's back and passed through both of his lungs and his heart.

William Cotton testified that he had known the Sanders brothers for five or six years. On 4 February 1985, Richard and Steven Sanders picked him up. Richard was driving a gray or silver Opel automobile with Steven on the passenger side. The trio drove to a store where they purchased beer and two "regular toboggans." After leaving the store they went to "the trailer park out Airport Road." They first drove past the mobile home park. Richard then turned the car around and drove to the mobile home park where he backed into a side road. Richard and Steven got out, and "they said they be back in five or ten minutes." The defendants said that they were going to try to get some marijuana. They walked toward the mobile home park. Cotton "jumped around to the passenger seat and got in." The car was parked "about a hundred yards out from the mobile home on the . . . opposite side of the road."

Cotton had been sitting in the car for approximately fifteen minutes when he was approached by a friend, Vincent Atwater. Cotton moved the car "up to the next road up from the trailer" so he could talk to Atwater. Atwater asked where Richard was, and Cotton said he would be right back. When Atwater left, Cotton moved the car back to the spot where the defendants had "told [him] to park." By the time Cotton returned the car, "Richard was coming running up." Richard jumped into the car and said: "Get out of here" and "I like to got shot." Steven then jumped into the back seat. Cotton drove the defendants to their mother's house in Chatham County where Richard took a shower. Richard then drove Cotton back to town and dropped him off.

Vincent Atwater testified that he knew the defendants well and that he had seen their gray Opel "a thousand times." He corroborated Cotton's testimony and said that he had seen the defendants' car at Hilltop Mobile Home Park on 4 February 1985.

The State also offered the testimony of various law enforcement officers concerning their investigation of the incident.

The defendants offered no evidence during the guilt-innocence phase of the trial.

[1] By their first assignments of error, the defendants argue that the trial court erred when it denied their challenges of venireman Milton Rogerson for cause. Rogerson had come into

contact with the defendants prior to 4 February 1984 when performing the duties of his position as Chief Court Counselor for Judicial District Fifteen-B of the State of North Carolina.

After the trial court denied their challenges for cause, the defendant Richard Sanders' trial counsel exercised the last peremptory challenge allowed him under N.C.G.S. § 15A-1217(a) and excused Rogerson. The defendant Steven Sanders had previously exhausted all peremptory challenges available to him.

Rebecca Thigpen was the next prospective juror to be called for *voir dire* examination. Both defendants and the State stated that they were satisfied with Thigpen and she was seated as the twelfth juror.

The trial court next commenced the selection of three alternate jurors. Larry Pearson was the last of the three alternate jurors chosen. When he was called for *voir dire* examination, the defendants had exhausted all additional peremptory challenges available to them under N.C.G.S. § 15A-1217(c). Following an examination of Pearson, counsel for the defendants requested an additional peremptory challenge in order to excuse him. The defendants' request was denied and Pearson was seated as the third alternate juror.

The defendants may not now be heard to complain on appeal that the trial court erred in denying their challenges of the prospective juror Rogerson for cause, since they failed to comply at trial with the requirements of N.C.G.S. § 15A-1214(h) and (i). By failing to comply with the procedure made mandatory by the statute, the defendants failed to preserve the purported error for appellate review.

The pertinent parts of the statute expressly require that:

(h) In order for a defendant to seek reversal of the case on appeal on the ground that the judge refused to allow a challenge made for cause, he must have:

(1) Exhausted the peremptory challenges available to him;

(2) *Renewed his challenge as provided in subsection (i) of this section; and*

(3) Had his renewal motion denied as to the juror in question.

> (i) A party who has exhausted his peremptory challenges may move orally or in writing to *renew a challenge for cause previously denied* if the party either:
>
> (1) Had peremptorily challenged the juror; or
>
> (2) States in the motion that he would have challenged that juror peremptorily had his challenges not been exhausted.
>
> The judge may reconsider his denial of the challenge for cause, reconsidering facts and arguments previously adduced or taking cognizance of additional facts and arguments presented. If upon reconsideration the judge determines that the juror should have been excused for cause, he must allow the party an additional peremptory challenge.

N.C.G.S. § 15A-1214(h) & (i) (1983) (emphasis added). The defendants at no time sought to renew any of their previously denied challenges for cause. Therefore, they failed to comply with the statute and are not entitled to any relief on appeal as a result of alleged errors by the trial court in denying their challenges for cause.

The defendants, however, argue that by exhausting their peremptory challenges and thereafter seeking to challenge an alternate juror peremptorily, their exception was preserved for appellate review under our former common law. The defendants cite *State v. Watson*, 310 N.C. 384, 396, 312 S.E. 2d 448, 456 (1984) in support of their contention that our former common law rule in this regard still applies and entitles them to appellate review. Although in *Watson* we mentioned our former common law rule for preserving this type of error, we did not intend to imply in any way that the former rule now provides an alternative method of preserving such issues for appeal or relieves defendants of the mandatory requirements of the statute. As we stated in *Silhan*, "[t]o the extent that a constitutionally valid statute overrules or supplements the dictates of one of our cases the statute is, of course, controlling." *State v. Silhan*, 302 N.C. 223, 239, 275 S.E. 2d 450, 464 (1981). The statutory method for preserving a defendant's right to seek appellate relief when a trial court refuses to allow a challenge for cause is mandatory and is the only method by which such rulings may be preserved for appellate review.

Additionally, even had the defendants complied with the statute in this case, they would have been entitled to no relief. The jury which actually considered the case and rendered the verdicts against the defendants was comprised of the original twelve regular jurors, since it did not become necessary to use any of the alternates. Each of the twelve jurors actually seated as regular jurors and who rendered the verdicts here were acceptable to the State and to both defendants. The defendants were able, either through use of their peremptory challenges or challenges for cause, to excuse from the jury which actually considered their case all jurors they found objectionable. It has always been the law in this jurisdiction that a defendant's right to excuse jurors, either peremptorily or for cause, is the right

> not to select but to reject jurors; and if the jury as drawn be fair and impartial, the complaining party would be entitled to no more upon a new trial, and this he has already had on the first trial. [Citations omitted.] Hence the ruling, even if erroneous, would be harmless.

*State v. Young*, 287 N.C. 377, 389, 214 S.E. 2d 763, 772 (1975), *quoting State v. Levy*, 187 N.C. 581, 122 S.E. 386 (1924). *See State v. Brittain*, 89 N.C. 481 (1883); *State v. Holmes*, 63 N.C. 18 (1868); *State v. Arthur*, 13 N.C. 217 (1830). When a defendant has expressed satisfaction at trial with the jurors who actually considered his case and fails to show on appeal that any such juror was unable to be fair and impartial, the defendant has failed entirely to show possible prejudice from the denial of his challenges for cause and is entitled to no relief. *Id.; State v. Watson*, 310 N.C. at 397, 312 S.E. 2d at 456. *But, cf. Batson v. Kentucky*, 476 U.S. ---, 90 L.Ed. 2d 69 (1986) (showing of actual prejudice not required where prosecutor excuses a class of prospective jurors on the basis of race); *State v. Jackson*, 317 N.C. 1, 343 S.E. 2d 814 (1986) (*Batson* rule applicable only to cases in which jury selection took place after the Supreme Court rendered its decision in that case). This assignment of error is overruled.

[2] By their assignments of error the defendants also contend that the trial court erred when it denied their motions to suppress the introduction into evidence of a pair of Nike tennis shoes seized when the defendant Steven Sanders was arrested. We dr not agree.

Prior to trial the defendants filed motions to suppress the introduction of the tennis shoes. They argued that the shoes had been seized under an invalid search warrant. A pretrial suppression hearing was held on 3 June 1985, and the trial court entered an order on 14 June 1985 denying the motion. In its order the trial court concluded that the search warrant was valid.

At trial the defendants moved to suppress the shoes on the ground that they were seized incident to an unlawful arrest and on the ground that the search warrant was improperly issued. Various witnesses were examined during a *voir dire* hearing. Thereafter, the trial court denied the defendants' motions to suppress without stating its ground for admitting the evidence.

We find it unnecessary to decide whether the shoes were seized under the authority of a valid search warrant. With regard to the defendant Steven Sanders, the seizure of the shoes was proper under the rule permitting searches and seizures incident to a lawful arrest. The defendant Richard Sanders may not be heard to complain on appeal because he has failed to demonstrate standing to seek suppression of the shoes.

On 7 February 1985, arrest warrants were issued for the defendants charging them with the murder and other crimes which are the subject of their appeal in this case. Search warrants also were issued authorizing the search of the residence of the defendants' grandmother, Nettie Williams. Law enforcement officers then went to the residence of Nettie Williams to execute the arrest warrants and search warrants. Evidence introduced at the *voir dire* hearing conducted during the defendants' trial tended to show that upon arriving at Williams' residence, the officers went to the door. At that time the defendant Steven Sanders was in a back bedroom standing at the foot of a bed. The officers were admitted to the residence and arrested Steven Sanders pursuant to warrants for his arrest. While arresting Steven Sanders, the officers discovered and seized a pair of Nike tennis shoes "around the bed." The defendants' brother, Christopher Todd Sanders, was present and stated that they belonged to the defendant Steven Sanders.

In the course of the *voir dire* hearing during the trial, the defendants stated *inter alia* that the warrants for their arrest were unlawful and that the Nike tennis shoes were inadmissible

as having been seized pursuant to an unlawful arrest. The defendants offered no evidence whatsoever in support of their argument that the arrest of Steven was unlawful, however, and concentrated instead upon their efforts to show that the search warrants for the Williams' home were invalid. On appeal to this Court, neither defendant questions the lawfulness of his arrest.

Without question a "search without a search warrant may be made incident to a lawful arrest; however, the scope of search is limited to the arrestee's person and the area within his immediate control." *State v. Hardy*, 299 N.C. 445, 455, 263 S.E. 2d 711, 718 (1980). "When an arrest is made, it is reasonable for the arresting officer to search without a warrant the suspect and the area within his immediate control for weapons and evidentiary items which may be concealed or destroyed." *State v. Hunter*, 299 N.C. 29, 34, 261 S.E. 2d 189, 193 (1980). *See Chimel v. California*, 395 U.S. 752, 23 L.Ed. 2d 685, *rehearing denied*, 396 U.S. 869, 24 L.Ed. 2d 124 (1969); *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L.Ed. 2d 796 (1980).

When the defendant Steven Sanders was arrested, he was standing at the foot of a bed in a back bedroom of his grandmother's home. The Nike shoes were discovered and seized "around the bed" where he was standing. All of the evidence tended to show clearly that the shoes were in an area within his immediate control and were items which could easily be concealed or destroyed. The seizure of the shoes was reasonable and lawful as having been made incident to a lawful arrest. This assignment of error is overruled.

This assignment of error is also overruled as to defendant Richard Sanders because he failed to show standing to seek suppression of the shoes. N.C.G.S. § 15A-972 provides: "When an indictment has been returned . . . a defendant *who is aggrieved* may move to suppress evidence in accordance with the terms of this Article." (Emphasis added.) In *State v. Taylor*, 298 N.C. 405, 415-16, 259 S.E. 2d 502, 508 (1979), we stated:

[A] defendant is 'aggrieved' and 'may move to suppress evidence' under G.S. 15A-972 only when it appears that his *personal* rights, not those of some third party, may have been violated, and such defendant has the burden of estab-

lishing that he is an 'aggrieved' party before his motion to suppress will be considered.

Thus, before the defendant Richard Sanders properly could challenge the legality of the search and seizure in question, he was required to demonstrate that the bedroom in his grandmother's home where the shoes were seized was an area in which he had a reasonable expectation of privacy. *State v. Taylor*, 298 N.C. at 416, 259 S.E. 2d at 508. This he entirely failed to do.

The record is void of any evidence that Richard Sanders had any possessory interest in the house or room where the shoes were seized. At the very most the record shows that he had previously lived in the house and was at the time of his arrest a frequent visitor. Moreover, Richard Sanders was not present at the house when the officers arrested the defendant Steven Sanders and seized the shoes. The defendant Richard Sanders failed to establish that he was an "aggrieved" party under N.C.G.S. § 15A-972. Therefore, the trial court did not err when it denied his motions to suppress the shoes in question.

[3] Lastly, the defendants argue that: "The imposition of a sentence based upon a verdict of guilty returned by a jury drawn from a venire from which potential jurors were excluded because of their scruples against capital punishment deprives the defendant of his right to due process of law and his right to trial by a jury." This assignment of error is without merit and is overruled. *See generally Lockhart v. McCree*, 476 U.S. 162, 90 L.Ed. 2d 137 (1986); *State v. Barts*, 316 N.C. 666, 343 S.E. 2d 828 (1986); *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982).

The defendants received a fair trial free from prejudicial error.

No error.