STATE OF NORTH CAROLINA v. ROBERT THURMAN CARTER

No. 436A92

(Filed 28 January 1994)

1. **Jury § 192 (NCI4th)— murder—jury selection—excusal for cause denied—challenge not renewed—no error**

There was no error in a murder prosecution where the trial court denied defendant's challenge for cause of a prospec-

tive juror and defendant did not renew his challenge for cause after exhausting his peremptory challenges as mandated by N.C.G.S. § 15A-1214(h) and (i). Even if defendant had complied with the statute, any error would have been harmless because the original juror was excused on a peremptory challenge and, although defendant was denied an additional peremptory challenge with which to strike an alternate juror, the alternate did not serve as one of the jurors who decided the case.

**Am Jur 2d, Jury § 218.**

2. **Homicide § 378 (NCI4th)— murder—evidence of self-defense introduced by State—other evidence raising inference of premeditation**

The trial court did not err by submitting to the jury first-degree murder based on premeditation and deliberation where defendant contended that the State was bound by defendant's claim of self-defense because the State introduced the claim during its direct examination of two officers and did not present any contradictory evidence, but there was evidence which, while not directly contradictory, raised the legitimate inference that defendant killed with premeditation and deliberation and not in self-defense.

**Am Jur 2d, Homicide § 448.**

3. **Evidence and Witnesses § 754 (NCI4th)— murder—seizure of weapon—no prejudice—claim of self-defense**

There was no prejudicial error in a first-degree murder prosecution in the admission of the handgun used in the killings where defendant contended that the warrant under which the handgun was seized was invalid but also claimed self-defense. He told a bartender that he had shot two people, told a detective that he had killed two people and asked to be brought in, and admitted in the presence of another detective that he had shot the victims. Under these circumstances, admission of the gun was of such insignificant probative value that its admission was harmless.

**Am Jur 2d, Appeal and Error § 806.**

4. **Evidence and Witnesses § 1080 (NCI4th)— murder—rights read to defendant—admissible**

The trial court did not err in a murder prosecution by admitting testimony by a detective that defendant was ad-

STATE v. CARTER

[335 N.C. 422 (1994)]

vised of his rights in the interrogation room at the police department. The detective only testified that defendant was read his rights and understood those rights and was not asked whether defendant had exercised his right to remain silent. Defense counsel had attacked the professionalism of the law enforcement officers who had investigated the case at numerous points; the evidence that defendant was read his rights and that he understood those rights tends to refute the characterization of the officers' conduct as unprofessional.

**Am Jur 2d, Evidence §§ 638 et seq.; Homicide § 339.**

**Comment Note. — Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1054.**

Appeal pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Hobgood, J., at the 21 November 1991 Criminal Session of Superior Court, Scotland County, upon a jury verdict finding defendant guilty of first-degree murder. On 16 April 1993 this Court allowed defendant's motion to bypass the Court of Appeals as to an additional judgment of imprisonment entered upon a jury verdict finding defendant guilty of second-degree murder. Presented before the Supreme Court on 13 October 1993 for decision upon written briefs without oral argument pursuant to Rule 30(d) of the North Carolina Rules of Appellate Procedure.

*Michael F. Easley, Attorney General, by Debra C. Graves, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was indicted for two counts of first-degree murder and was tried capitally. A jury found defendant guilty of the first-degree murder of Ezekiel Ross, Jr. and of the second-degree murder of Carrie Council. The trial court sentenced defendant to consecutive terms of life imprisonment for the first-degree murder, pursuant to the jury's recommendation, and fifty years imprisonment for

the second-degree murder. On appeal, defendant raises four assignments of error. We find no error.

The State's evidence tended to show that on 19 September 1989 at about 12:30 p.m., law enforcement officers found the body of Carrie Council in the carport of her home. She had been shot three times, once in the abdomen, once in the chest, and once in the arm. There was no gunpowder residue on her clothing or wounds, which indicated that the gun was fired from a distance.

The officers found the body of Council's boyfriend, Ezekiel Ross, Jr., inside Council's house in the hallway leading to the bathroom. He had been shot three times. One of the three bullets entered Ross's back. There was no gunpowder residue on Ross's wounds or clothing, which indicated that the gun was fired from a distance. According to the testimony of the medical examiner, Council and Ross had been dead for at least three hours when officers found their bodies.

SBI Agent Marrs testified that four of the bullets recovered from the bodies and the area beneath the bodies had been fired from defendant's .32 Smith and Wesson revolver. Two bullets were too deformed to identify their source; however, Marrs testified that they had probably been fired from the same revolver.

Carrie Council's neighbor, Martha Broady, testified that Council had been at home the evening before the shootings. On the morning of the shootings, Broady walked outside her house at about 8:30 a.m. and noticed Council's car and a blue and white car that she had not seen before in the driveway. Between 10:00 a.m. and 11:00 a.m., Broady noticed a brown and black Chevrolet Blazer at Council's, which she later saw speed by her and then return to Council's driveway. She then saw a tall, heavy-set, black man enter the carport and bend down to do something. Broady had seen this man and his truck at Council's on other occasions. Several other witnesses testified that defendant owned a brown and black Blazer.

Sheila Amaning, Council's daughter, testified that Ross had been her mother's boyfriend in 1982 and 1983. She stated that in April of 1989 defendant showed up at her mother's house and told Council that he had heard about her and was looking for a good woman. Defendant frequently called Council, sometimes four times a night. In June or July of 1989 defendant arrived at Council's

house as Council was thanking Roy Wilson, the father of a neighbor, for cutting her lawn. Amaning testified that defendant told Council, "If I ever come here and see another man in this house, I'll kill him."

Jasper Mears testified that he sold alcoholic beverages by the glass in his home without a permit. Defendant was one of his customers; he often stopped there after work in the morning for a drink. On the morning of the shootings, defendant arrived at Mears' home between 8:15 and 8:30 a.m. after having visited Council. He told Mears that he had lost his girlfriend because she had gone back to her former boyfriend, who was at Council's residence when defendant left. Defendant left Mears' home about 9:00 a.m. but returned five minutes later. Defendant was pacing and stated that he was going back to Council's. Mears stated that defendant was not drinking. Defendant left Mears' home about 9:30 a.m.

Mears further testified that later that day defendant phoned him and stated, "I know I owe you but I can't pay you now because I just shot two people." He told Mears that he was at home and Detective Jack Poe was coming to pick him up. Ray Lynn Ford, who had been visiting Mears' establishment that day, corroborated Mears' testimony. After the phone call from defendant, Mears went to defendant's home, approached defendant, who was in a police car, and asked him, "Did you really shoot those people?" Mears testified that defendant only smiled. The officers who were present testified that defendant nodded affirmatively in response.

Lieutenant Jack Poe, Chief of Detectives of the Laurinburg Police Department, testified that after viewing the scene of the shootings, he spoke with Broady, who told him about the Blazer. Poe had known defendant for twenty years and knew defendant drove a Blazer that fit the description that Broady gave. Poe called Mears and spoke with Ford, who told Poe about the call defendant had made to Mears. Poe obtained an arrest warrant and called defendant, who told him he had killed two people and he wanted Poe to pick him up.

Poe testified that he went to defendant's home. At defendant's request Poe allowed defendant to go into his bedroom to remove his jewelry. Poe followed him and noticed a revolver under the pillow on the bed. He did not tell other officers about the revolver. Poe then took defendant to the police department.

While defendant was in the patrol car on the way to the police department, he explained what had happened that morning. He told Poe that Council had called him and asked him to come to her home at 7:00 a.m. Defendant arrived about 8:00 a.m. and found a man there with Council. The man told defendant to leave, to which defendant responded that it was up to Council to tell him to leave. Defendant and the man began to argue. The man opened a cabinet drawer to get a knife. Defendant then shot the man and Council. Defendant repeated several times that he shot the man in self-defense.

No weapon was found at the scene. Detective A.E. Woodard testified that Detective Michael Porter obtained a search warrant for the gun. Woodard then went to the jail where defendant was being held and told defendant they had a warrant and were going to search his house. Defendant told Woodard he would save them time, to get the key to his house from the jailer, and that the gun was under a pillow on the bed in his bedroom. Woodard did not ask defendant any questions. Officers then went to defendant's home and executed the warrant. The revolver, which was seized, was under a bed pillow, fully loaded. A box of ammunition was found in a closet.

Defendant presented no evidence.

[1] Defendant assigns as error the trial court's denial of his challenge for cause to prospective juror Maxine White. Defendant failed to renew his challenge for cause and therefore did not comply with N.C.G.S. § 15A-1214(h) and (i). These provisions mandate:

> (h) In order for a defendant to seek reversal of the case on appeal on the ground that the judge refused to allow a challenge made for cause, he must have:
>
> (1) Exhausted the peremptory challenges available to him;
>
> (2) Renewed his challenge as provided in subsection (i) of this section; and
>
> (3) Had his renewal motion denied as to the juror in question.
>
> (i) A party who has exhausted his peremptory challenges may move orally or in writing to renew a challenge for cause previously denied if the party either:

(1) Had peremptorily challenged the juror; or

(2) States in the motion that he would have challenged that juror peremptorily had his challenges not been exhausted.

N.C.G.S. § 15A-1214(h), (i) (1988). Defendant exhausted his peremptories but did not renew his challenge for cause. Failure to comply with these requirements forecloses defendant's appeal of the denial of the challenge for cause. *State v. Quick*, 329 N.C. 1, 17, 405 S.E.2d 179, 189 (1991); *State v. Sanders*, 317 N.C. 602, 608, 346 S.E.2d 451, 455-56 (1986).

Even if defendant had complied with the statute, he would not be entitled to relief. Defendant contends that because he used all his peremptories, including one to strike prospective juror White, and was denied an additional peremptory with which to strike alternate juror Mitchell Peele, he was denied his right to an impartial jury. Alternate juror Peele did not serve as one of the twelve jurors who decided defendant's case. In *Sanders* we stated:

When a defendant has expressed satisfaction at trial with the jurors who actually considered his case and fails to show on appeal that any such juror was unable to be fair and impartial, the defendant has failed entirely to show possible prejudice from the denial of his challenges for cause and is entitled to no relief.

*Sanders*, 317 N.C. at 609, 346 S.E.2d at 456. Here, defendant used either peremptories or challenges for cause to remove all jurors whom he deemed unacceptable from the twelve who actually decided his case. Thus, even if the trial court's denial of his challenge for cause were error, it would be harmless. *Young*, 287 N.C. at 389, 214 S.E.2d at 772 (citing *State v. Levy*, 187 N.C. 581, 587-88, 122 S.E. 386, 390 (1924)).

[2] Defendant next assigns as error the trial court's denial of his motion to dismiss the first-degree murder charge based on malice, premeditation and deliberation. After his arrest, defendant made voluntary statements claiming that Ross opened a kitchen drawer to retrieve a knife with which to attack defendant and that defendant then shot him in self-defense. The State introduced defendant's claim of self-defense during its direct examination of Detective A.E. Woodard and Lieutenant Jack Poe. According to defendant, because the State did not present any evidence to con-

tradict the exculpatory features of defendant's statements, the State is bound by defendant's claim of self-defense, which would excuse the killing if the self-defense were perfect or reduce the charge from murder to manslaughter if imperfect.

In ruling on a motion to dismiss a first-degree murder charge, the trial court must consider the evidence in the light most favorable to the State, giving the State every reasonable inference to be drawn therefrom. *State v. Jackson*, 317 N.C. 1, 22, 343 S.E.2d 814, 827 (1986), *judgment vacated on other grounds*, 479 U.S. 1077, 94 L. Ed. 2d 133 (1987). Substantial evidence must be introduced that tends to prove each essential element of the crime charged and that defendant committed the crime. *Id.* The evidence may contain contradictions or discrepancies; these are for the jury to resolve and do not require dismissal. *Id.* at 22-23, 343 S.E.2d at 827.

First-degree murder is the killing of a human being with malice, premeditation and deliberation. *See* N.C.G.S. § 14-17 (1993); *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). "Premeditation" means that the defendant formed the specific intent to kill the victim "for some length of time, however short" before the murderous act. *State v. Joyner*, 329 N.C. 211, 215, 404 S.E.2d 653, 655 (1991) (quoting *State v. Biggs*, 292 N.C. 328, 337, 233 S.E.2d 512, 517 (1977) ). "Deliberation" means that the defendant formed the intent to kill in a cool state of blood and not as a result of a violent passion due to sufficient provocation. *State v. Stager*, 329 N.C. 278, 323, 406 S.E.2d 876, 902 (1991). Usually premeditation and deliberation are not proved by direct evidence but instead are proved "by actions and circumstances surrounding the killing." *Joyner*, 329 N.C. at 215, 404 S.E.2d at 655. Examples of such circumstances and actions are:

> (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner.

*State v. Huffstetler*, 312 N.C. 92, 109-10, 322 S.E.2d 110, 121 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985).

In *State v. Carter*, 254 N.C. 475, 479, 119 S.E.2d 461, 464 (1961), this Court stated:

> When the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be false by any other facts or circumstances in evidence, the State is bound by these statements.

> And when the State's evidence and that of the defendant is to the same effect, and tend only to exculpate the defendant, his motion for judgment as of nonsuit should be allowed.

(Citations omitted.) The State, however, is not bound by an exculpatory statement "which it introduces if there is 'other evidence tending to throw a different light on the circumstances of the homicide.'" *State v. Rook*, 304 N.C. 201, 228, 283 S.E.2d 732, 748-49 (1981) (quoting *State v. Bright*, 237 N.C. 475, 477, 75 S.E.2d 407, 408 (1953)), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982); *see also Jackson*, 317 N.C. at 23-24, 343 S.E.2d at 828; *State v. Wooten*, 295 N.C. 378, 385-88, 245 S.E.2d 699, 704-05 (1978).

Here, defendant's claim of self-defense is set in relief by other evidence that casts a different light on the circumstances of this killing. The evidence, taken in the light most favorable to the State, showed that no knives or other weapons were found at the scene of the crime and no drawers were open. Ross was shot three times, once in the back. Prior to the day of the shooting, defendant threatened, "If I ever come here and see another man in this house, I'll kill him." After the shooting, defendant told Jasper Mears and later Lieutenant Poe that he had shot two people but did not at that time claim that he had done so in self-defense. Though this evidence does not directly contradict defendant's statement, it raises the legitimate inference that defendant killed with premeditation and deliberation and not in self-defense. The issue is for the jury to resolve, and the trial court did not err in submitting the first-degree murder charge based on premeditation and deliberation. *See Wooten*, 295 N.C. at 387-88, 245 S.E.2d at 704-05 (upholding denial of defendant's motion for judgment as of nonsuit where defendant stated he killed in self-defense rather than in course of robbery, and evidence, taken as a whole, supported felony-murder theory); *State v. Hankerson*, 288 N.C. 632, 637-38, 220 S.E.2d 575, 580-81 (upholding denial of defendant's motion for judgment as of nonsuit where defendant made exculpatory statements claiming self-defense, and evidence, though not directly contradictory,

supported second-degree murder), *rev'd on other grounds*, 432 U.S. 233, 53 L. Ed. 2d 306 (1977).

[3] By his third assignment of error, defendant argues that the trial court should not have admitted into evidence the handgun used in the shootings. Officers seized the handgun pursuant to a search warrant after defendant's arrest. According to defendant, the affidavit supporting the warrant contained information that was obtained in violation of defendant's Fifth Amendment right to counsel, which consequently rendered the warrant invalid and the handgun seized pursuant thereto inadmissible.

We need not address the question of whether the information in the warrant was obtained in violation of defendant's constitutional right to counsel. Assuming arguendo that defendant's constitutional right was violated, the admission of the gun was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988). Defendant's defense to the charge of Ross's murder was self-defense, not that he was not the killer. Defendant told Mears that he had shot two people. When Detective Poe called defendant, defendant stated that he had killed two people and asked to be brought in. In the presence of Detective Woodard, defendant again admitted he had shot Council and Ross. Under these circumstances, admission of the gun "was of such insignificant probative value when compared with the overwhelming competent evidence of guilt that its admission did not contribute to defendant's conviction and therefore admission of the evidence was harmless . . . beyond a reasonable doubt." *State v. Gardner*, 315 N.C. 444, 449, 340 S.E.2d 701, 705-06 (1986) (quoting *State v. Williams*, 288 N.C. 680, 693, 220 S.E.2d 558, 568 (1975)).

[4] By his final assignment of error, defendant contends that the trial court should not have admitted the testimony of Detective Porter, elicited by the State, that defendant was advised of his Miranda rights while in the interrogation room at the police department. Defendant argues that his exercise of his right to remain silent was used against him, which violated his privilege against self-incrimination under the United States and North Carolina Constitutions. U.S. Const. amends. V, XIV; N.C. Const. art. I, § 23. Further, defendant claims this evidence was not relevant to any material issue in the case and that it suggested to the jury that defendant refused to make a statement and allowed it to infer guilt therefrom.

STATE v. CARTER

[335 N.C. 422 (1994)]

A criminal defendant's exercise of his right to remain silent cannot be used against him "to impeach an explanation subsequently offered at trial." *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98 (1976); *see State v. Hoyle*, 325 N.C. 232, 236-37, 382 S.E.2d 752, 754 (1989). In *Greer v. Miller*, 483 U.S. 756, 764, 97 L. Ed. 2d 618, 629 (1987), the United States Supreme Court stated that *Doyle* applies to those cases in which "the trial court has permitted specific inquiry or argument respecting the defendant's post-*Miranda* silence." Here, the State did not ask Porter whether defendant exercised his right to remain silent. Porter only testified that defendant was read his rights and indicated he understood those rights. No specific inquiry or argument was made about defendant's silence. Defendant's exercise of his right to remain silent therefore was not used against him and his constitutional rights were not violated.

Contrary to defendant's assertion, the evidence that defendant was read his Miranda rights and that he understood them was relevant. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). At numerous points in the trial, defense counsel attacked the professionalism of the conduct of the law enforcement officers who investigated the case. When examining these officers, defense counsel suggested that the crime scene had not been secured, that the evidence had been moved, and that various tests, such as blood tracing and bullet trajectory tracking, should have been performed on the evidence. The evidence that defendant was read his Miranda rights according to law and that he indicated his understanding of them tends to refute the characterization of the officers' conduct as unprofessional. This assignment of error is overruled.

We conclude that defendant received a fair trial, free from prejudicial error.

NO ERROR.